**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FRONTLINE DATA, INC.,

    Plaintiff/Counterclaim Defendant,

    v.

CRS, INC.,

    Defendant/Counterclaim Plaintiff.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 07-2457

Hon. Eduardo C. Robreno

**CRS'S BRIEF ON THE MEANING OF**
**DISPUTED CLAIM TERMS IN FRONTLINE'S PATENTS**

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND OF THE INVENTIONS ...................................................2

III.    THE ASSERTED FRONTLINE CLAIMS ...................................................3

        A.      The Asserted Method Claims..............................................................4

        B.      The Asserted Systems Claims.............................................................5

        C.      The Asserted Computer-Readable Medium Claims ............................7

IV.     THE RELEVANT PROSECUTION HISTORY OF THE ASSERTED
        CLAIMS ........................................................................................................8

        A.      Reexamination of the '151 Patent Claims ............................................8

        B.      Prosecution of the '519 Patent Claims...............................................12

V.      STATEMENT OF THE LAW OF CLAIM CONSTRUCTION......................13

VI.     CRS'S CONSTRUCTION OF THE FRONTLINE  PATENT CLAIMS ........14

        A.      All Claims Require a Receiving Response From a Worker Comprising
                an "Acceptance" or "Accepting" One or More Posted Positions, i.e.,
                "an Expression by the Worker Agreeing to Fill a Position Resulting in
                an Automatic Securing of the Position When the Electronic
                Acceptance Is Received Without Further Processing for Fulfillment of
                the Same Position or Further Selection Review"....................................15

        B.      All Claims Equate "Securing" with Automatically Halting Further
                Processing for the Fulfillment of the Same Position by Other Workers
                Upon Electronic Receipt of an Acceptance from a Worker and Filling
                the Posted Position With Said Worker Without Further Selection
                Review ...............................................................................................17

        C.      "Computer-Readable Medium" in Asserted Claims 13 and 30 of the
                '519 Patent is a Term Expressly Defined in the '519 Patent
                Specification ......................................................................................20

        D.      "Substitute Fulfillment" Is Defined in the Patents-in-Suit as  "Location
                of a Replacement to Fill a Temporary Employee Absence in an
                Organization"......................................................................................21

        E.      The Claimed Inventions Are Directed To Performing Centralized
                Substitute Fulfillment and Centralized Position Fulfillment .................22

F.      The Court Needs To Resolve The Ambiguity Present In The
        "Generating And Posting" Clause of Asserted Claims 3, 16, 24, and 33
        of the Reexamined '151 Patent ..............................................................................24

VII.    CONCLUSION...............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Andersen Corp. v. Fiber Composites, LLC,*
    474 F.3d 1361 (Fed. Cir. 2007)........................................................................17

*Atofina v. Great Lakes Chem. Corp.,*
    441 F.3d 991 (Fed. Cir. 2006)..........................................................................17

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
    334 F.3d 1294 (Fed. Cir. 2003)........................................................................14

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.,*
    508 F.3d 1366 (Fed. Cir. 2007)........................................................................14

*Interactive Gift Express, Inc. v. Compuserve, Inc.,*
    256 F.3d 1323 (Fed. Cir. 2001)........................................................................14

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
    383 F.3d 1295 (Fed. Cir. 2004)........................................................................20

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ................................. 13-14

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004)........................................................................19

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003)........................................................................14

*On Demand Machine Corp. v. Ingram Indus., Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006)........................................................................24

*Phillip v. AHW Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)...........................................14, 19, 20, 22

*Verizon Services Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007)........................................................................19

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)..........................................................................14

**STATUTES**

35 U.S.C. § 112, first paragraph ........................................................................11

## I.      INTRODUCTION

CRS, Inc. ("CRS") respectfully requests that the Court construe claims asserted by Front-line Data, Inc. ("Frontline") in reexamined U.S. Patent No. 6, 675,151 ("the '151 patent") and U.S. Patent No. 7,430,519 ("the '519 patent") consistent with the express language of the claims, the embodiments disclosed and enabled in the patents, and the representations made by Frontline during patent prosecution to distinguish the prior art.  CRS's proposed constructions of disputed claim terms in the '151 and '519 patents are attached as Exhibit 1.  Copies of the '151 patent, the '151 reexamination certificate, and the '519 patent are attached as Exhibits 2-4, respectively.

Although there are a number of terms that require construction by the Court, the most important dispute between the parties concerns the meaning of the terms "acceptance," "accept-ing," and "securing" in response to receiving an acceptance (or a response accepting step).  As discussed in detail below, the patents' specifications and their prosecution histories make clear that such language was expressly added during prosecution to specifically distinguish the claimed inventions over the prior art of record.  In addition, Frontline's remarks during patent prosecution reveal that those terms were assigned highly detailed and specialized meanings that went far beyond the ordinary meaning of such terms, and that the Patent Examiner specifically relied upon Frontline's representations in deciding to allow the claims at issue.

Frontline's interpretation of its claims is entirely result-oriented.  It is concerned not with what the intrinsic evidence actually reveals about the proper legal scope of the claimed inven-tions, but rather with advocating an overly broad, litigation-induced construction designed solely to read on CRS' products and services.  Frontline's interpretation not only blithely ignores the definitions set forth in its patent specifications, but is so broad as to cover approaches expressly disparaged and distinguished in its own patent specifications and in representations it made to the U.S. Patent and Trademark Office ("PTO") during patent prosecution to avoid the prior art.

There is simply no basis in law for Frontline to expand the scope of its claims to cover methods that it did not invent, disclose, or claim in its patent and, indeed, even disclaimed during patent prosecution.

## II.   BACKGROUND OF THE INVENTIONS

The patents-in-suit relate generally to systems and methods for performing automated substitute fulfillment (i.e., locating a replacement, for example, a substitute teacher, to fill a temporary employee absence in an organization such as school district).  The two patents are related, and they name the same two inventors.  Frontline filed Application No. 09/419,266 on October 15, 1999, which issued as the '151 patent on January 6, 2004.  The '151 patent is a continuation-in-part of Application No. 09/217,116, filed on December 21, 1998, that issued as U.S. Patent No. 6,334,133 ("the '133 patent").  See Exhibit 2, page 1.  Frontline filed Application No. 09/683,093 on November 16, 2001, which issued as the '519 patent on September 30, 2008.  The ''519 patent is a continuation-in-part of  application No. 09/217,116, as well as a continuation-in-part of Application No. 09/419,266.  See Exhibit 4, page 1.

Although the patents claim a number of embodiments with certain variations, as discussed in the patent specifications, they are generally directed to an automated system or method for performing substitute fulfillment for an organization that wishes to replace an employee during a temporary absence or to otherwise fill an available position.[1]  Exhibit 2, col. 4, ln. 64 - col. 5, ln. 1.  In certain preferred embodiments, a computer server is configured for managing substitute fulfillment, compiling information, and notifying parties for multiple client organizations.  The server maintains substitute fulfillment data, contact data, notification information, and other

---

[1] References herein will primarily be to the specification of the '151 patent, although similar references can be found in the specification of the '519 patent since the disclosures are related.

2

data in a central database for one or more client organizations utilizing the system.  The organizations enter substitute fulfillment data and contact data via a website hosted by the server.  The system sends updates to and receives updates from an organization's local database via the Internet or a telephone network.  Exhibit 2, col. 5, lns. 4-16.

In one scenario, the employee who is going to be absent contacts the substitute fulfillment system, registers his or her absence, and triggers the automated substitute fulfillment procedure.  The substitute fulfillment system uses the database to identify potential substitutes based on preferences or criteria selected by the organization and then contacts those potential substitutes to identify their availability.  The system continues to contact potential substitutes until one is found or until the list of possible substitutes is exhausted and all potential substitutes have refused the assignment.  If the substitute accepts the assignment, the system relays necessary instructions to the substitute worker, such as the time and place to report to work.  See Exhibit 2 at col. 5, lns. 17-40.

In another variant -- one that  specifically relates to the claims at issue -- the substitute fulfillment system can post a listing of job opportunities on a website hosted by the server.  The potential substitute can access the website, review the listings, and affirmatively select an assignment that he or she will fill.  See Exhibit 2 at col. 12, lns. 33-39; Exhibit 4 at col. 14, ln. 10 to col. 15, ln. 8.

## III.    THE ASSERTED FRONTLINE CLAIMS

At present, Frontline has asserted infringement by CRS of claims 3, 6, 7, 16, 24, and 33

of the reexamined '151 patent and claims 10, 13, 24, 25, and 30 of the '519 patent.[2]  These pa-

tents contain three types of claims regarding substitute fulfillment: claims to a **method** (e.g.,

reexamination claims 3, 16, 24, and 33 of the '151 patent and claim 10 of the '519 patent),

claims to a **system** (e.g., reexamination claims 6 and 7 of the '519 patent and claims 24 and 25 of

the '519 patent), and claims to a **computer-readable medium** (e.g., claims 13 and 30 of the '519

patent).

### A.       The Asserted Method Claims

Reexamination claim 3 of the '151 patent is typical of the method claims asserted by

Frontline in this case:

> 3.       A method for performing substitute fulfillment for a plurality of different organizations comprising:
>
> receiving absentee information representing an absent worker *that will be or is physically absent from an organization worksite* via at least one communication link;
>
> generating and posting *by one or more computers* a list of one or more positions of one or more absent workers that need to be filled by one or more substitutes workers on a website *and providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position*;
>
> receiving a response **[by]** *comprising an acceptance, by the one or more computers, from* a substitute worker selecting a posted position on the website via an Internet communication link; and
>
> securing, *in response to receiving the acceptance form [sic: from] the substitute worker,* via the Internet communication link *and the one or more computers, the posted position for* the substitute worker who selected the posted position to fill in for the absent worker, *the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker.*[3]

_____

[2] As discovery is still ongoing, CRS has not finally determined which claims it will assert are invalid at trial.  However, at this time CRS does not believe that any additional claims will raise new claim construction issues and that the Court's ruling on disputed terms in the asserted claims will likely control the interpretation of similar or identical terms in any other claims that may be asserted.

[3] Exhibit 3, claim 3.  The material in italics indicates additions to the patent claim during reexamination of the '151 and the material in bold brackets indicates material that was deleted during reexamination.

Reexamination claim 16, which is dependent upon method claim 3, adds two further limitations, namely, that the receiving step "*comprises receiving electronically the acceptance by the substitute worker from the website on which the list of one or more positions was posted*" and that the securing step "*comprises generating by the one or more computers information that the position was secured to the substitute worker and sending or posting this information via the Internet communication link to the substitute worker.*"  Exhibit 3, claim 16.  Reexamination claim 24, which is also dependent upon method claim 3, adds the limitation that the information provided "*comprises information on a start time for an absence of the absent worker.*"  Exhibit 3, claim 24.  Reexamination claim 33, which is also dependent upon method claim 3, adds the limitation that the receiving step "*comprises receiving an acceptance from one of the substitute workers by a web communication link.*"  Exhibit 3, claim 33.

Method claim 10 of the '519 patent employs language substantially similar to that recited in reexamination method claim 3 of the '151 patent, but varies somewhat in scope.  Insofar as the issue of claim construction for the Court is concerned, there are only two minor differences to note.  Specifically, reexamination claim 3 of the '151 patent recites receiving a response "comprising an acceptance" from the substitute worker selecting the posted position on the website and securing that position in response to "receiving the acceptance," while claim 10 of the '519 patent recites receiving a response by a substitute worker "accepting" one or more posted positions on the website and securing such position or positions in response to "the receiving a response accepting step."  Exhibit 4, claim 10.  Claim 10 of the '519 patent also explicitly requires that securing step be secured "electronically."

**B.     The Asserted Systems Claims**

Reexamination claim 6 is typical of the system claims asserted by Frontline in this case:

5

6.     A substitute fulfillment system that secures one or more substitute workers for a plurality of organizations comprising:

a data base comprising worker records, said worker records having information associated with workers for each of the organizations, and substitute records, said substitute records having information associated with at least one substitute worker; and

*one or more computers comprising* a server connected to the database, the server configured for:

receiving absentee information representing an absent worker *that will be or is physically absent from an organization worksite* via at least one communication link;

generating and posting a list of one or more positions of one or more absent workers that need to be filled by one or more substitutes workers on a website *and providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position*;

receiving a response [by] *comprising an acceptance from* a substitute worker selecting a posted position on the website via an Internet communication link; and

securing, *in response to receiving the acceptance from the substitute worker,* via the Internet communication link *and the one or more computers, the posted position for* the substitute worker who selected the posted position to fill in for the absent worker, *the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker*.

Exhibit 3, claim 6.  As can be seen, the claimed server is configured to generally carry out the steps recited in reexamination method claim 3.

Claim 7, which is dependent upon reexamined system claim 3, adds the limitation that the server "is further configured to generate a list of substitute workers and absent workers who the substitute workers will be filling in for a given organization and to transmit the generated list of substitute workers and names of the absent workers who the substitute workers will be filling in for to the given organization via the at least one communication link."  Exhibit 2, claim 7.

System claim 24 of the '519 patent employs language substantially similar to that recited in reexamination system claim 6 of the '151 patent, but varies somewhat in scope.  Insofar as the issue of claim construction for the Court is concerned, there are only two minor differences to note.  Specifically, reexamination claim 6 of the '151 patent employs the terms "absent worker"

and "substitute worker," whereas claim 24 of the '519 patent employs the more generic terms "first worker" and "second worker."  In addition, reexamination claim 6 of the '151 patent recites receiving a response "comprising an acceptance" from the substitute worker selecting the posted position on the website and securing that position in response to "receiving the acceptance," while claim 24 of the '519 patent recites receiving a response by a second worker "accepting" the posted position and securing that position in response to "the receiving a response accepting step."  Exhibit 4, claim 24.

Claim 25, which is dependent upon claim 24 of the '519 patent, adds the limitation that "each of the least one communication link is selected from the group consisting of a telephone communication link or an Internet communication link."  Exhibit 4, claim 25.

### C.    The Asserted Computer-Readable Medium Claims

In addition to method and system claims, the '519 patent also claims certain "computer-readable medium bearing instructions for performing substitute fulfillment."  Claim 13 of the '519 patent is typical of the computer-readable medium claims asserted by Frontline in this case:

> 13. A computer-readable medium bearing instructions for performing substitute fulfillment, said instructions being arranged to cause one or more processors upon execution thereof to perform the steps of:
> receiving absentee information representing an absent worker via at least one communication link;
> generating a list of positions of one or more absent workers that need to be filled by one or more substitute workers;
> posting the list of positions of one or more absent workers that  need to be filled by one or more substitute workers on a website;
> receiving a response by a substitute worker accepting one of the one or more posted positions on the website via an Internet communication link; and
> securing, in response to the receiving a response accepting step, the posted position for the substitute worker who accepted the posted position to fill in for the absent worker.

Exhibit 4, claim 13.

Computer-readable medium claim 30 of the '519 patent employs language substantially

similar to that recited in computer-readable medium claim 13 of the '519, but varies somewhat in scope.  Insofar as the issue of claim construction for the Court is concerned, there are only two minor differences to note.  Claim 13 is concerned with "substitute fulfillment" and employs the terms "absent worker" and "substitute worker," whereas claim 30 is concerned with "position fulfillment" and employs the more generic term "worker."  In addition, claim 30 does not require that the receiving a response acceptance step be via an Internet communication link.

## IV.     THE RELEVANT PROSECUTION HISTORY OF THE ASSERTED CLAIMS

Understanding the prosecution history of the patents-in-suit is critically important to the Court's legal construction of the asserted claims, particularly with regard to the disputed meaning of the terms "acceptance," "accepting," "securing, in response to receiving the acceptance . . ." and variants thereof.  Those terms were not present in the claims set forth in the original patent applications that gave rise to the '151 and '519 patents.  In fact, those terms were not even present in the '151 patent that issued on January 6, 2004.  For example, original claim 3 of the '151 patent merely recited broad general language concerning "receiving a response by a substitute worker selecting a posted position . . ." and "securing via the Internet communication link the substitute worker . . . ."  Ex. 2, claim 3, col. 19, lns. 1-5.

### A.     Reexamination of the '151 Patent Claims

CRS filed a request with the PTO to reexamine the claims of  '151 patent, contending that claims 3-13 of the '151 patent were invalid in view of  U.S. Patent No. 6,466,914 ("Mitsuoka") (Exhibit 5) alone or in combination with CRS's Automatic Substitute Finder System ("SubFinder™") (Exhibit 6).[4]   The PTO granted this request on October 24, 2007.  See Exhibit 7.  On December 18, 2008, the PTO rejected claims 3-13 as being invalid in light of Mitsuoka or a

---

[4] SubFinder™ is the name of an early substitution fulfillment product developed by CRS.

combination of Mitsuoka with SubFinder.  See Exhibit 8.

Frontline's prosecuting attorney had an interview with the Patent Examiner on January 27, 2009 where the Frontline product was demonstrated.  The Examiner's Interview Summary reveals that Frontline's representative argued that the invention could be distinguished over Mitsuoka because the Frontline "systems parallel processing (tasks) we[re] locked (e.g., halted) upon 'receiving a response by a substitute worker selecting a posted position' as claimed."  Exhibit 9 at 2.  However, the Examiner maintained that claim 3 as then written did "not expressly require the halting (or locking) of parallel processing or related tasks responsive to receiving a response" and that the "securing" limitation "could be interpreted as nearly any responsive signal to the selection of a substitute worker."  *Id*.

As a result, Frontline filed a response on February 18, 2009 which amended the language of claims 3 and 6 and added new claims 14-55.  See Exhibit 10 at 2-15.  Among the changes made was the addition of the phrase "comprising an acceptance . . ." to the receiving steps of claims 3 and 6 and the addition of the phrase "in response to receiving the acceptance from the substitute worker" to the securing steps of claims 3 and 6.  Exhibit 10 at pages 16-18.   In addition, these claims were amended to recite "the securing comprising substantially immediately halting any current parallel processing for fulfillment of the same position."  Exhibit 10 at 17-18.

Frontline also discussed the earlier January 27, 2009 examiner interview where the two inventors, Messrs. Thompson and Blackstone, portrayed two substitute workers attempting to accept a position using an embodiment of the claimed system on the web.  "During the demonstration, the system received the acceptance from Mr. Blackstone and substantially immediately halted parallel processing for fulfillment of the same position for Mr. Thompson."  Exhibit 10 at 29.  This operation, which Frontline said was "represented by the *'securing'* limitation," was ar-

gued to distinguish the Mitsuoka reference.  *Id*.  Frontline also represented that, in Mitsuoka, the

"received response is not an acceptance that causes the *substantially immediate halting* of paral-

lel processing for fulfillment of the same position."  *Id*.  (emphasis added).

Frontline also elaborated on how Mitsuoka's approach differed from Frontline's.  Under

Mitsuoka's approach:

> If the contractor is interested, he/she clicks 'APPLY' on the website for that job. . . .
> When the website of Mitsuoka receives the 'Apply' click, it stores this information as re-
> levant information, and then it makes a final award/selection with one of the disclosed al-
> gorithms using its "contractor selector portion 320."

Exhibit 10 at 33-34.  The Examiner contended "that a contract is formed when the substitute

clicks 'Apply,'" *id*. at 34, but Frontline insisted that that was not the case:

> The Mitsuoka "Apply" has a different meaning than the word *"acceptance."*
> This difference is that **receipt of an "acceptance" in the claimed system results
> in an automatic *"securing"* of the position** when the **electronic acceptance** is
> received.  The Mitsuoka "contractor selector portion 320" must subsequently per-
> form its selection algorithm and make a selection decision.
>
> In contrast, the claimed invention is designed to obviate the need for Mit-
> suoka's "contractor selector portion 320" and its various selection algorithms.
>
> **The claimed method and system operate to make an offer such that,
> when an acceptance is received from the substitute worker on an Internet
> communication link, the posted position is substantially immediately secured
> to the substitute work, i.e., any parallel processing for fulfillment of the same
> job is halted.**  This point has been clarified by adding the word *"acceptance"* to
> the second *"receiving"* operation, and by clarifying the term *"securing,"* to ex-
> plicitly recite the following language for this operation:
>
>> *securing, in response to receiving the acceptance from the
>> substitute worker, via the Internet communication link and
>> one or more computers, the posted position for the substi-
>> tute worker who selected the posted position to fill in for
>> the absent worker, the securing comprising substantially
>> immediately halting any current parallel processing for ful-
>> fillment of the same position.*
>
> This means that the system of the claim is configured so that **the decision
> on filling a position is made by the substitute electronically sending the ac-**

10

**ceptance, which directly causes the securing.**  In contrast, in Mitsuoka the deci-
sion to award the contract translation to the independent contractor is made sub-
sequently by the contractor selector portion 320.

Exhibit 10 at 34-35 (italics in original; emphasis added).   Frontline also noted that "[p]arallel

processing cannot occur in Mitsuoka precisely because a contractor selector portion 320 is used

as the decision-maker."  Exhibit 10 at 36.

      Frontline also filed an affidavit by co-inventor Mr. Blackstone, President of Frontline,

asserting that the alleged commercial success of the Frontline system relied upon to support pa-

tentability "arises from the claimed invention's provision of a system and method to receive ab-

sence information for organization positions, post information about the absent positions on the

Web, receive via an Internet communication link an acceptance from a teacher, and have the sys-

tem immediately secure the position to that teacher and halt any parallel processing of parallel

instances on the Web for fulfillment of the same position, and any parallel processing for the po-

sition on the telephone calling system."  Exhibit 11 at ¶  15.

      On May 25, 2009, the Examiner finally rejected claims 3-55.  Although the examiner be-

lieved that Frontline's amended claims now sufficiently distinguished over the prior art, it re-

jected the claims for a lack of an adequate written description under 35 U.S.C. §  112, first para-

graph, because the new amended phrase "halting any current parallel processing for fulfillment"

lacked support in the patent specification.  Exhibit 12 at 2-5.  However, based on its familiarity

with the case, the Examiner thought it possible that "parallel processing" was a misnomer for the

process described in the patent where a potential replacement accepts a request and "further

processing of the listing for that opportunity is halted at the server."  Exhibit 12 at 3.

      Consequently, on June 15, 2009, Frontline agreed that what it intended was not parallel

processing per se but **"halting at the one or more computers further processing to fulfill the**

**posted position with any other substitute worker."** Exhibit 13 at 22 (emphasis added).  Accordingly, Frontline further amended the claims to include such language and to delete the phrase "parallel processing."  *Id*.

Frontline's amendments and remarks were sufficient to convince the Examiner to allow the amended claims on July 16, 2009.  In allowing the reexamined claims, the Examiner expressly stated that he was allowing the amended claims because

> the prior art of record does not explicitly disclose the features of amended, independent claims 3 and 6 requiring a system and method of one or more computers configured to receive absentee information about an absent worker that will be or is physically absent from a worksite via a communication link, further generating and posting a list of positions that need to be filed [sic: filled] by workers on a website and providing, for one or more of the positions, information indicating directly or indirectly a worksite location for the position, and subsequently, receiving an acceptance from the one or more computers from a substitute worker selecting a posted position, and in response securing the acceptance from a substitute worker via an internet connection selecting a posted position, where the securing comprises halting further processing to fulfill the posted position with an other [sic: another] substitute worker at the one or more computer[s] as now required by amended independent claims 3 and 6.

Exhibit 14 at 3 (emphasis in original)  The PTO subsequently issued its Reexamination Certificate on October 20, 2009, which indicates all amendments to the claims in italics.  Exhibit 3.

### B.     Prosecution of the '519 Patent Claims

The prosecution history of the '519 patent is consistent with the  reexamination prosecution history.  Although Frontline filed its original application on November 16, 2001, due to a protracted series of Examiner rejections and applicant amendments, the '519 patent did not issue until September 30, 2008, nearly seven years later.  In an Office Action dated January 3, 2008, the Examiner for the first time indicated that certain claims were allowable over the prior art while continuing to reject other claims as being obvious in view of the on SubFinder™ reference.  The allowable claims, however, were nonetheless rejected for obviousness-type double patenting.  Exhibit 15 at 3-11.  (N.B. Asserted claims 10, 13, 24, 25, and 30 of the '519 patent

were respectively designated as application claims 22, 25, 37, 38, and 44 during prosecution and renumbered only after the claims had been finally allowed.)

On April 7, 2008, in an attempt to overcome the Examiner's prior art and obviousness-type double patenting rejections, Frontline amended its claims to add language about receiving a response "accepting" a posted position, securing such a position "in response to receiving a response accepting step," and variants thereof.  See Exhibit 16 at 2-16.  In the remarks accompanying Frontline's amendment, Frontline argued that "the steps of receiving an **acceptance electronically** and securing electronically **in response to the accepting step** have been added to place the claim in context."  Exhibit 16 at 18 (emphasis added).   Frontline expressly noted:

> the allowable claims have been amended to further clarify that the **response received is an acceptance of the job offer**, and that the securing step is performed electronically in response to the accepting step.  The actual main securing operation takes place in the server.  Thus it is clarified that the **securing is performed electronically**."

*Id*. at 18 (emphasis added).

Frontline's amendments and remarks were sufficient to convince the Examiner to allow the amended claims on July 14, 2008.  In allowing the claims, the Examiner explicitly stated that she was allowing the claims because

> [n]one of the prior art of record, taken individually or in any combination, teach, inter alia, [w]ith respect to claims 9-16, 21-23, 25-42, 44-53 and 55-74, a method, system and computer readable medium for performing position fulfillment including generating a list of one or more positions that need to be filled by one or more workers; receiving a response by a worker **accepting** one of the one or more posted positions; and securing, **in response to the receiving a response accepting step**, the posted position for the worker who accepted the posted position.

Exhibit 17 at 3 (emphasis added).

## V.   STATEMENT OF THE LAW OF CLAIM CONSTRUCTION

In *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), the Federal Circuit made clear that claim construction "is still based

upon the patent and prosecution history."  Claim terms are generally given their ordinary and accustomed meaning unless the patent and the prosecution history expressly indicate that the terms were used differently by the inventor.[5]  The Federal Circuit has repeatedly held that one must give meaning to all limitations in a claim and has consistently refused to adopt illogical constructions that omit claim limitations or otherwise render claim terms redundant or superfluous.[6]

In *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), the Federal Circuit characterized the specification as often being "dispositive" and "the single best guide to the meaning of a disputed term."  The written description in the specification is significant because it "may act as a sort of dictionary, which explains the invention and may define terms used in the claims."  *Markman*, 52 F.3d at 979.  The validity of both *Markman*  and *Vitronics* was reaffirmed in *Phillip v. AHW Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

The prosecution history is the "'undisputed public record' of proceedings in the Patent and Trademark Office [and] is of primary significance in understanding the claims."  *Markman*, 52 F.3d at  980.  It often can "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Phillips*, 415 F.3d at 1317.  Moreover, "[p]rosecution disclaimer 'promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.'"  *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007) (*quoting Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)).

## VI.    CRS'S CONSTRUCTION OF THE FRONTLINE  PATENT CLAIMS

---

[5] *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298-99 (Fed. Cir. 2003).

[6] *See, e.g.*, *Interactive Gif . v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996).

Although there is minor variation of language in the eleven asserted claims in the two patents-in-suit, all of the terms or phrases in dispute are used in the same or essentially the same way in multiple claims, thereby reducing the parties' disputes to certain discrete categories.

### A.   All Claims Require Receiving a Response From a Worker Comprising an "Acceptance" or "Accepting" One or More Posted Positions, i.e., "an Expression by the Worker Agreeing to Fill a Position Resulting in an Automatic Securing of the Position When the Electronic Acceptance Is Received Without Further Processing for Fulfillment of the Same Position or Further Selection Review"

As discussed in detail above, Frontline added the words "acceptance" or "accepting" by amendment to the asserted claims in both patents-in-suit, in order to distinguish Frontline's claims over the prior art.  The Examiner in each case specifically relied upon the addition of such language in his or her decision to allow the claims.  See Exhibit 14 at 3; Exhibit 17 at 3.

Frontline now advocates an unspecified "plain reading" of the claims, but it is apparent that Frontline already assigned during patent prosecution a highly detailed and specialized meaning to the terms "acceptance" and "accepting."  Moreover, the meaning of these terms is inexorably tied to and defined in relation to the "securing" step.

First, it is apparent that not every worker response transmitted over a web interface is necessarily an "acceptance."  Frontline unambiguously distinguished its claimed invention from systems like Mitsuoka where a substitute worker expressed interest in a position or applied for a position, but the final decision to hire the individual was subsequently made by the system after further review of the individual's qualifications, the qualifications of other candidates, and/or consideration of other factors.  Exhibit 10 at 29, 33-35.  Instead, Frontline argued its claimed inventions reversed the situation so that the system makes an offer to the substitute worker and "the decision on filling a position is made by the substitute electronically sending the acceptance."  Exhibit 10 at 35; see also Exhibit 16 at 18 ("the response received is an acceptance of

15

the job offer"). Thus, the acceptance must be an expression by the worker contractually agreeing to fill the position that is not subject to any further review by the system.

Second, Frontline also functionally defined "acceptance" in such a way that the "receipt of the 'acceptance' in the claimed system results in an automatic 'securing' of the position when the electronic acceptance is received," that is, halting "further processing to fulfill the posted position with any other substitute worker." Exhibit 10 at 34-35; Exhibit 13 at 22; see also Exhibit 16 at 18-19 (discussing steps of receiving an acceptance electronically and securing electronically in response to the accepting step). In other words, in the Frontline system the acceptance must result in an automatic securing of the position when the electronic acceptance is received without further processing for fulfillment of the same position. When an applicant applied for a position in the Mitsuoka system, however, the transmittal of the applicant's response over the web did not automatically secure the position for the applicant. The Mitsuoka system, unlike the Frontline system, continues to accept other applicants for the position and it is possible that it might award the position to one of those other applicants.

The prosecution history taken as a whole establishes that Frontline disclaimed coverage for and did not intend the claims to encompass methods, systems, or computer readable medium bearing instructions for performing substitute fulfillment in certain situations, such as when (1) a worker's electronic response did not constitute a contractual agreement to fill a position, (2) a worker's electronic response did not automatically secure the position when the electronic response was received by the server, (3) a worker's electronic response permitted further processing to fulfill the posted position with another worker, or (4) a worker's electronic response permitted further selection review of the candidate's suitability by the server before the worker is actually hired.

Only after Frontline made that clear on the public record did the Examiner allow the

claims over the Mitsuoka patent and the SubFinder™ reference. Frontline made such a clear

and unambiguous disclaimer during prosecution to gain allowance over the prior art, and thus

cannot now run away from such positions and argue a contrary interpretation of its claims before

this Court. *See Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1373-74 (Fed. Cir.

2007) (finding explicit arguments made during prosecution to overcome prior art constituted suf-

ficient disavowal of claim scope to warrant a narrow claim interpretation); *Atofina v. Great*

*Lakes Chem. Corp.*, 441 F.3d 991, 997 (Fed. Cir. 2006) (finding applicant's representations dur-

ing prosecution amount to a clear disclaimer of claim scope).

Frontline's admissions have been incorporated into CRS's proposed constructions f the

terms "acceptance" and "accepting" in the asserted claims as set forth in Exhibit 1. CRS's pro-

posed constructions differ from each other only to the extent necessary to conform to the gram-

matical structure of the asserted claims and to utilize the appropriate terminology set forth in a

given claim (e.g., "substitute worker," "second worker" or "worker").

**B.      All Claims Equate "Securing" with Automatically Halting Further
Processing for the Fulfillment of the Same Position by Other Workers
Upon Electronic Receipt of an Acceptance from a Worker and Filling the
Posted Position With Said Worker Without Further Selection Review**

The asserted claims in the reexamined '151 patent all recite "securing, in response to re-

ceiving the acceptance from the substitute worker . . . ." such that the "securing comprises halt-

ing, at the one or more computers, further processing to fulfill the posted position with any other

substitute worker."   What is missing from Frontline's purported "plain reading" of the claims is

**<u>when</u>** the securing or halting takes place and any acknowledgement that further processing is

halted **<u>because</u>** the posted position has been filled by substitute worker who accepted the posi-

tion. Under Frontline's current reading of the claims, the securing or halting could take place

hours or even days after the substitute worker's acceptance is obtained.  Indeed, even the prior art Mitsuoka system will eventually "secure" the position for the applicant **after** its contractor selector portion 320 performs its selection algorithm and selects the applicant.

The reexamination prosecution history, however, makes clear that Frontline intended receipt of the electronic acceptance in the claimed inventions to result in an "**automatic**" securing of the position.  Exhibit 10 at 34 (emphasis added).  Indeed, unless the halting step immediately secures the position for the substitute worker, then it will be possible for other substitute workers to accept the same position.  Moreover, given Frontline's admission that the claimed invention is "designed to obviate the need for Mitsuoka's 'contractor selector portion 320' and its various selection algorithms," Exhibit 10 at 34, "securing" is also equated with "filling" the posted position with a substitute who accepted the position without any further selection review.

Similarly, the asserted claims in the '519 patent all recite "securing, in response to the receiving a response accepting step . . . ."  The '519 prosecution history on this claim term is not as extensive as that set forth in the reexamination prosecution history for the '151 patent, but Frontline made consistent representations that "the allowable claims have been amended to further clarify that the response received is an **acceptance** of the job offer, and that the securing step is performed **electronically** in response to the accepting step."  Exhibit 16 at 18 (emphasis added).  Indeed, Frontline went on to reiterate two sentences later that the securing is performed "**electronically**," *id.*, even though only one of the asserted claims in the '519 patent expressly recites "securing electronically."[7]  The clear implication of such representations is that a position is secured because it is to be filled by a worker who has accepted the job offer, thereby inherent-

---

[7] CRS submits that the securing step in all the asserted claims is inherently performed electronically to the extent that servers or computer-readable medium bearing instructions for performing position fulfillment are involved and/or if one is attempting to halt further processing for the fulfillment of the same position by other workers who seek to accept via an Internet or telephone communication link.

ly necessitating that further processing for the fulfillment of the same position by other workers be halted without further selection review.  Moreover, because the securing step is performed electronically in response to the accepting step, it is performed **automatically**.

The patent specification of the '519 patent supports this construction.  The asserted claims in the '519 patent relate to the embodiment disclosed under the heading "List Of Opportunities for Substitute Workers" in column 14 of the patent.  The specification explains how the substitute workers 32 can access the website containing available job listings and select an assignment.  However, if "the same assignment is currently being processed or waiting to be processed by the IVR system 24, then the assignment selection is recognized, **further processing is halted**, and appropriate reports generated."  Exhibit 4, col. 14 at lns. 14-19.

Unless the claimed securing step in the asserted claims of the '519 patent require that such further processing is halted, Frontline faces the same problem with its claims that the Patent Examiner noted with regard to the claims of the '151 patent, namely, that the "securing" limitation could be interpreted as nearly any responsive signal to the selection of a substitute worker and that the claims would be invalid in view of Mitsuoka.  See  Exhibit 9 at 2.  However, it is well established that claims are to be construed if possible so as to preserve their validity.  *Phillips*, 415 F.3d at 1327.  Moreover, when both patents are related and stem from a common ancestor patent application, as in the present case, the Federal Circuit has held that it is appropriate to rely upon representations made during the prosecution of one patent that constitute a clear disavowal of claim scope in order to consistently construe similar terms in a related patent.  *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004).

CRS's proposed constructions  of the "securing" steps in the asserted claims take into ac-

count Frontline's arguments and representations to the PTO during prosecution.  See Exhibit 1.

CRS's proposed constructions differ from each other only to the extent necessary to conform to

the grammatical structure of the asserted claims and to utilize the appropriate terminology set

forth in a given claim (e.g., "substitute worker," "second worker" or "worker").

### C.      "Computer-Readable Medium" in Asserted Claims 13 and 30 of the '519 Patent is a Term Expressly Defined in the '519 Patent Specification

Frontline advocates an unspecified "plain meaning" of the term "computer-readable me-

dium," a term found in the preamble of claims 13 and 30 of the '519 patent.  In this case, howev-

er, Frontline's inventors have elected to be their own lexicographers and expressly defined this

term broadly in the patent specification:

> The term "computer readable medium" as used herein refers to any me-
> dium that participates in providing instructions to processor 52 for execution.
> Such a medium may take many forms, including but not limited to, non-volatile
> media, volatile media, and transmission media.  Non-volatile media include, for
> example, optical or magnetic discs.  Volatile media include dynamic memory,
> such as main memory 46.  Transmission media include coaxial cables, copper
> wire, and fiber optics, including conductors that comprise a bus 44.  Transmis-
> sion media can also take the form of acoustic or electromagnetic waves, such as
> those generated during radio frequency (RF) and infrared (IR) data communica-
> tions.  Common forms of computer-readable media include, for example, a floppy
> disk, a flexible disk, hard disk, magnetic tape, any other magnetic medium, a CD-
> ROM, DVD, any other optical medium, punch cards, paper tape, any other physi-
> cal medium, with patterns of holes, a RAM, a PROM (programmable ROM), and
> EPROM (electronically PROM), a FLASH-EPROM, any other memory chip or
> cartridge, a carrier wave, or any other medium from which a computer can read.

Exhibit 4 at col. 9, lns. 22-42.

When, as here, the inventors have specially defined a claimed term in their patent specifi-

cation, the definition set forth in the patent specification is controlling.  *Phillips*, 415 F.3d at

1316 (inventor's lexicography governs when specification reveals a special definition given to a

claim term by the patentee that differs from the meaning it would otherwise possess); *see also*

*Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004)  (patentee's

"clear intent" to rely on the four corners of his patent to define fully the terms at issue obviates any presumption that a claim term carries its ordinary and customary meaning).  Frontline should not be permitted to later argue, for example, that "computer-readable medium" means "transmission media" but not "non-volatile media" or that it means "non-volatile media" but not "volatile media."  Moreover, CRS is entitled to rely upon Frontline's own broad definition of "computer-readable medium" to establish the invalidity of claims 13 and/or 30 of the '519 patent at trial.  Consequently, it is necessary that each recited example of non-volatile media, volatile media, and transmission media be included in the construction ultimately adopted by the Court.

CRS has adopted the definition of "computer-readable medium" contained in the '519 patent specification as its proposed construction  of the term "computer-readable medium" in claims 13 and 30 of the '519 patent as set forth in Exhibit 1.  Although the definition in the specification comprises a number of separate sentences, CRS has condensde the language down to a single sentence with appropriate changes in grammar and punctuation.  CRS, however, has no objection if the Court prefers to adopt the language at column 9, lines 22-42 verbatim.

### D.  "Substitute Fulfillment" Is Defined in the Patents-in-Suit as "Location of a Replacement to Fill a Temporary Employee Absence in an Organization"

Like "computer-readable medium," Frontline consciously set forth a definition of the term "substitute fulfillment" directly in the first column of the specification of each patent-in-suit.  See claims 3, 6, 7, 16, 24, and 33 of the reexamined '151 patent and claims 10, 13, 24, and 25 of the '519 patent.  For example, in the '151 patent specification, Frontline expressly stated that the process referred to as "substitute fulfillment" meant "location of a replacement to fill a temporary employee absence in an organization."  Exhibit 2, col. 1, lns. 29-31.  The identical definition is also set forth in the '519 patent specification.  Exhibit 4, col. 1, lns. 21-23.

Accordingly, CRS submits that the Court should adopt Frontline's special definition set

21

forth in the patent specification in construing the term "substitute fulfillment" in the asserted patent claims.  *Phillips*, 415 F.3d at  1316.  Such a proposed construction is set forth in Exhibit 1.

Claim 30 of the '519 patent is the only asserted claim that does not contain the term "substitute fulfillment."  Instead, it recites the related concept of "position fulfillment."  Although no express definition of "position fulfillment" is set forth in the '519 patent (and this term is also not found in any dictionary), common sense dictates that this term should be construed in a manner parallel with how the term "substitute fulfillment" as defined in the patent.  This leads to the conclusion that "position fulfillment" in claim 30 of the '519 patent means "location of a worker to fill a position in an organization."

### E.    The Claimed Inventions Are Directed To Performing Centralized Substitute Fulfillment and Centralized Position Fulfillment

As the specifications and claims for the patents-in-suit make clear, the purported goal and advantage of the claimed systems and methods is to perform **centralized** substitute fulfillment (or position fulfillment).  This is most readily seen by the preamble language of reexamination claims 3 and 6 of the '151 patent in which substitute fulfillment is performed  "for a plurality of different organizations" and in claim 24 of the '519 patent in which the substitute fulfillment system comprises a server coupled to a database containing worker records associated with "workers for one or more organizations."  Exhibit 3, claims 3, 6; Exhibit 4, claim 24.

Consistent with such claim language, the '151 patent specification expressly notes that the "present invention relates to systems and methods . . . for centralizing substitute fulfillment."  Exhibit 2 at col. 1, lns. 21-24.  In both patents, the inventors distinguished prior art systems in which each school district handled its own substitute fulfillment in a "decentralized" manner making it "virtually impossible for school districts to share information and common substitute fulfillment resources.  Exhibit 2 at col. 4, lns. 8-16; Exhibit 4 at col. 3, lns. 61-65.  The inventors

also reported that organizations "require a centralized system and method of tracking workers' absences and entitlements."  Exhibit 2 at col. 4, lns. 22-25; Exhibit 4 at col. 4, lns. 5-7.  Consequently, a stated "advantage of the present invention" is "to maintain a central database of related information and to share information across organizations."  Exhibit 2 at col. 4, lns. 54-56; Exhibit 4 at col. 4, lns. 35-37.   As a result, the specification makes also makes reference to a "central database 34," a "central server 12," and a system 10 that is "centralized."  See Exhibit 2 at col. 9, ln. 16; col. 12, ln. 47; Exhibit 4 at col. 8, ln. 54.  "Because the system 10 is centralized, services multiple customers 56, and maintains a database 34 . . .  the system 10 of the present invention provides special opportunities to match substitutes across organizations 56 . . . ."  Exhibit 2 at col. 12, lns. 47-52.

The Examiner likewise understood the clamed inventions being directed toward centralized substitute fulfillment.  For example, in the Examiner's original rejection of the claims during reexamination, he expressly noted that "[s]ubstitute fulfillment, contact, absence, entitlement and notification data is stored **<u>centrally</u>** in a database on a server at a common site for multiple organizations employing the substitute fulfillment or notification system."  Exhibit 8 at 3 (emphasis added).  Significantly, the Examiner **<u>repeated</u>** this remark in his Reasons for Allowance, noting that such elements were conceptually disclosed in the prior art.  Exhibit 14 at 2-3.  At no time did Frontline ever dispute the Examiner's characterization of the claimed inventions or otherwise contend that they were directed to decentralized substitute fulfillment.

Under these circumstances, where Frontline relied upon centralized substitute fulfillment as being an advantage of the claimed inventions in its patent specifications, the Patent Examiner likewise understood Frontline to be claiming methods and systems for centralized substitute fulfillment, and asserted claims expressly recited providing substitute fulfillment for a plurality of

organizations, it is legally appropriate for the Court to construe the claims as performing centralized substitute fulfillment (or position fulfillment).  *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope.").

The particular construction applicable for each variation of the asserted claims are set forth in Exhibit 1.

> **F.  The Court Needs To Resolve The Ambiguity Present In The "Generating And Posting" Clause of Asserted Claims 3, 16, 24, and 33 of the Reexamined '151 Patent**

As discussed above, method claim 3 of the '151 patent was substantially amended during patent prosecution to overcome prior art rejections.  Ultimately, method claim 3 was allowed by the Examiner with the "generating and posting" clause amended as follows:

> generating and posting *by one or more computers* a list of one or more positions of one or more absent workers that need to be filled by one or more substitutes workers on a website *and providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position*;

Exhibit 3, claim 3.  A question has arising in CRS's mind as to whether or not the added phrase "by one or more computers" was intended to modify the added phrase "and providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position."  Counsel for Frontline declined to take a position on the question when counsel met to discuss the parties' proposed claim interpretations.

System claim 6 was amended at the same time in substantially the same way.  The language "one or more computers comprising" was added to its server clause, while the "and providing, for one or more of the positions, information indicating directly or indirectly an organiza-

tion worksite location for the respective position" language was added to its "generating and posting" clause. Exhibit 3, claim 6. Because of the way system claim 6 was drafted, the "one or more computers comprising" a server language necessarily modifies all the steps that the server is configured for, including the "generating and posting" step.

Presumably, the recited "one or more computers" language in the "generating and posting" clause of claim 3 was similarly intended to modify the entirety of the clause. CRS can find nothing in the intrinsic record which suggest that it should not. Indeed, it is difficult to conceive of how the claimed method could provide organization worksite location information to substitute workers on a website without the use of one or more computers. However, if the phrase "by one or more computers" does not modify the phrase "and providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position" language, then CRS is entitled to know that in preparing its noninfringement and invalidity defenses for trial.

## VII.   CONCLUSION

CRS respectfully requests this Court construe the disputed claim terms in the manner set forth in Exhibit 1.[8] A proposed Order embodying CRS's claim construction is enclosed.

Dated: September 10, 2010   Respectfully submitted,
/s/ *Darrel C. Karl*
Finnegan, Henderson, Farabow,
 Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

Charles S. Marion
Pepper Hamilton LLP

---

[8] CRS reserves the right to modify its proposed claim constructions as may become necessary in light of information that may develop during discovery or at trial.

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4119

*Attorneys for CRS, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 10th day of September, 2010, a true and correct copy of the foregoing CRS'S BRIEF ON THE MEANING OF DISPUTED CLAIM TERMS IN FRONTLINE'S PATENTS, EXHIBITS 1-17, and a PROPOSED ORDER  were served via electronic mail upon:

>   John E. McGlynn
>   Woodcock Washburn
>   Cira Centre, 12th Floor
>   2929 Arch Street
>   Philadelphia, PA  19104-2891
>   mcglynn@woodcock.com

This document has been filed electronically and is available for viewing and downloading from the ECF system.

/s/ *Darrel C. Karl*
DARREL C. KARL