IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRONTLINE PLACEMENT                 :
TECHNOLOGIES, INC.,                 :      CIVIL ACTION
                                    :      NO. 07-2457
                Plaintiff,          :
                                    :
       v.                           :
                                    :
CRS, INC.,                          :
                                    :
                Defendant.          :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          FEBRUARY 8, 2011

I.    INTRODUCTION

        Plaintiff Frontline Placement Technologies, Inc.
("Frontline" or "Plaintiff") filed this patent infringement and
breach of contract suit against Defendant CRS, Inc. ("CRS" or
"Defendant"), involving a service/technology that facilitates the
replacing of absent workers with substitute workers.[1]

        Before the Court are both parties' briefing on claim
construction with proffered definitions for the disputed claim
terms.  For the reasons set forth below, the Court defines the

_____

        [1]    This Court has jurisdiction, pursuant to 28 U.S.C. §§
1331 and 1338.

-1-

claim terms as set out in the conclusion.

## II.  BACKGROUND

On June 18, 2006, Plaintiff Frontline Placement Technologies, Inc. filed this patent infringement and breach of contract suit against Defendant CRS, Inc., involving a service/technology that facilitates the replacing of absent workers with substitute workers.  Therein, Plaintiff alleged patent infringement of the product called "Aesop" (the '151 Patent), which is described as a labor database wherein customers access a website to post worker absences for which substitutes are needed.  Substitute workers then access Aesop to search for posted worker absences and to commit to filling vacancies.  Users access Aesop via the internet using a web interface or via a telephone interactive voice response (IVR) system.  (See Am. Compl. ¶ 9.)

Frontline's predecessor, Frontline Data, patented this technology in January 2004.  In February 2004, Frontline Data filed a patent infringement suit against CRS and a settlement agreement was reached in November 2004 whereby Frontline Data would license its technology to CRS in return for royalties.

On August 8, 2007, the Patent Trade Office ("PTO") granted an ex parte reexamination of claims 3 through 13 of Frontline's '151 Patent.  Thus, the Court placed the action in

suspense on November 19, 2007. During the PTO reexamination claims 14 through 55 were added to the '151 Patent and claims 3, 6, 9, and 14-55 claims were listed in the reexam certificate as patentable. (See Am. Compl. ¶ 32, Ex. C.)

On September 30, 2008, during the '151 reexamination period, U.S. Patent No. 7,430,519 (the '519 Patent), titled "Substitute Fulfillment System" and a continuation-in-part of the '151 Patent, was legally issued by the PTO in the names of Roland R. Thompson, Michael S. Blackstone, and Ralph Julius. (Id. at ¶ 33-34.) Frontline is assignee and owner of the '519 Patent.

On January 14, 2010, Frontline filed its Amended Complaint, alleging that CRS has infringed or continued to infringe the reexamined '151 Patent associated with CRS's SubFinder. CRS's SubFinder is a program that facilitates the replacement of absent teachers with substitute teachers. Frontline also alleges that CRS has infringed or continues to infringe the '519 Patent with CRS's SubFinder. Therein, Frontline alleges both (1) patent infringement and (2) breach of contract claims and is seeking damages.

On Feburary 3, 2010, CRS filed its Amended Answer and raised various affirmative defenses and counterclaims, stating that Frontline has breached the limited license agreement for the '151 Patent and denying all claims for the '519 Patent

infringement.[2]  CRS requests declaratory judgment on the grounds
that: (1) there was no breach of contract on the part of CRS; (2)
there was no patent infringement for either the '151 or '519
Patents on the part of CRS; and (3) Frontline maintained an
invalid patent.

On February 23, 2010, Frontline filed an amended reply
denying CRS's counterclaims and asserting various affirmative
defenses including, but not limited to failure to state a claim,
unclean hands, patent invalidity, estoppel, laches, and "most
favored nation treatment" failure of a condition precedent.

On March 19, 2010, the parties filed a joint Rule 26(f)
report. (Doc. no. 32).  Therein, the parties propose a discovery
plan, with the idea of bifurcating discovery into 2 phases.
Phase One would include patents-in-suit discovery; specifically
focusing on: whether CRS's modified system infringes the patents-
in-suit.  Phase Two, would take place to the extent further
discovery on particular issues was necessary.

---

[2]     In its counterclaims, CRS asserts seven counts.  Count
I seeks a declaratory judgment that CRS did not infringe the '151
Patent.  Count II seeks a declaratory judgment that the '151
Patent is invalid.  Count III seeks a declaratory judgment that
CRS did not infringe the '519 Patent.  Count IV seeks a
declaratory judgment that the '519 Patent is invalid.  Count V
seeks a declaratory judgment that the CRS did not breach the '151
Patent limited license agreement.  Count VI is for breach of
contract - wrongful contract termination as to the '151 Patent
license agreement.  Count VII is a breach of contract for § 3.3
of the parties' license agreement.

## III. DISCUSSION

Before the Court are both parties' briefing on claim construction with proffered definitions for disputed claim terms. Frontline asserts that CRS infringed the following claims:

- **'151 Patent:** Claims 3, 6, 7, 16, 24, and 33

- **'519 Patent:** Claims 10, 13, 24, 25, and 30

The Claims can also be broken down by types:

- **Method Claims:** For Patent '151 (Claims 3, 16, 24, and

  33) and for Patent '519 (Claim 10)

- **Claims to a System:** For Patent '151 (Claims 6 and 7)

  and for Patent '519 (Claims 24 and

  25)

- **Claims to a Computer-Readable Medium:**

  For Patent '519 (Claims 13 and 30)

The Court will first address the relevant law and then apply the law to each set of related claim terms that are disputed.

## A. Legal Principles of Claim Construction

A court's analysis of patent infringement is comprised of a well-established two-step process: (1) the meaning of disputed claims are construed; and (2) the allegedly infringing device is compared to the claims as construed. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996); Wavetronix LLC v. EIS Electronic

Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009). With
respect to the first step, "[t]he purpose of claim construction
is to determine the meaning and scope of the patent claims that
the plaintiff alleges have been infringed." Every Penny Counts,
Inc. v. American Express Co., 563 F.3d 1378, 1382 (Fed. Cir.
2009) (citing O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,
521 F.3d 1351, 1360 (Fed. Cir. 2008)).

It is axiomatic that the claims define the scope of the
patent. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed Cir.
2005) (en banc) (internal citations omitted); see also,
Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
381 F.3d 1111, 1115 (Fed. Cir. 2004); Vitronics Corp. v.
Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).
Therefore, the Court must first look to the words of the claims
themselves in order to ascertain their meaning. Vitronics Corp.,
90 F.3d at 1582; see also Renishaw PLC v. Marposs Societa' per
Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[T]he claims
define the scope of the right to exclude; the claim construction
inquiry, therefore, begins and ends in all cases with the actual
words of the claim").

## 1. Plain and Ordinary Meaning

Claim terms must be initially interpreted according to
their ordinary and customary meaning. Genzyme Corp. v.

- 6 -

Transkaryotic Therapies, Inc., 346 F.3d 1094, 1106 (Fed. Cir.

2003). Undefined claims terms are to be given an ordinary and

customary meaning "as understood by a person of ordinary skill in

the art at the time of the invention." Gemtron Corp. v.

Saint-Gobain Corp., 572 F.3d 1371, 1378 (Fed. Cir. 2009). As

explained by the Federal Circuit:

> Because the meaning of a claim term as understood by
> persons of skill in the art is often not immediately
> apparent, and because patentees frequently use terms
> idiosyncratically, the court looks to 'those sources
> available to the public that show what a person of skill
> in the art would have understood disputed claim language
> to mean,' including 'the words of the claims themselves,
> the remainder of the specification, the prosecution
> history, and extrinsic evidence concerning relevant
> scientific principles, the meaning of technical terms,
> and the state of the art.

Phillips, 415 F.3d at 1314 (quoting Innova, 381 F.3d at 1116).


### 2. Intrinsic Evidence

Where a court cannot properly construe a claim based on

the plain meaning, it is necessary to examine the intrinsic

record of the claims, which includes the specification and the

prosecution history. Masco Corp. v. United States, 303 F.3d

1316, 1324 (Fed. Cir. 2002) (citing Vitronics Corp., 90 F.3d at

1582 (holding such intrinsic evidence to be "the most significant

source of the legally operative meaning of disputed claim

language"). The specification contains a written description of

the invention which must be clear and complete enough to enable

those of ordinary skill in the art to make and use the patented
product.  Thus, the specification provides necessary context for
understanding the claims, and "is always highly relevant to the
claim construction analysis."  Phillips, 415 F.3d at 1315
(quoting Vitronics Corp., 90 F.3d at 1582).  Therefore, a
patentee can act as his own lexicographer in the patent
specification by defining a term with particularity that already
has an ordinary meaning to a person of skill in the art.  Merck &
Co., Inc. v. Teva Pharma, USA, Inc.,

395 F.3d 1364, 1370 (Fed. Cir. 2005) (internal citation omitted);
Phillips, 415 F.3d at 1321 ("[T]he specification 'acts as a
dictionary when it expressly defines terms used in the claims . .
. .'") (internal quotation omitted).

On the other hand, "[w]hen consulting the specification
to clarify the meaning of claim terms, courts must take care not
to import limitations into the claims from the specification."
Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1288 (Fed. Cir.
2009).  Limitations contained in the specification should be
applied judiciously and courts should refrain from restricting
broader claim language to a single embodiment described in the
specification, "unless the patentee has demonstrated a clear
intention to limit the claim scope using 'words or expressions of
manifest exclusion or restriction.'"  Id. (quoting
Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed.

- 8 -

Cir. 2004)); see also Bell At. Network Servs., Inc. v. Covad
Commc'ns. Group, Inc., 262 F.3d 1258, 1271 (Fed. Cir. 2001)
("[W]hen a patentee uses a claim term throughout the entire
patent specification, in a manner consistent with only a single
meaning, he has defined that term 'by implication.'") (internal
quotation omitted).

Along with the specification, the prosecution history
is "intrinsic evidence" of the meaning of the claims, because it
"provides evidence of how the [United States Patent & Trademark
Office ("PTO")] and the inventor understood the patent."
Phillips, 415 F.3d at 1317. The prosecution history is comprised
of the original application, communications between the patent
applicant and the patent examiner, changes to the patent
application, prior art cited during the patent examination, and
other pertinent documents. See Rheox, Inc. v. Entact, Inc., 276
F.3d 1319, 1326 (Fed. Cir. 2002) (noting that the totality of the
prosecution history includes "amendments to claims and arguments
made to overcome or distinguish references.") (citing Elkay Mfg.
Co. v. Ebco Mfg. Co., 192 F.3d 973, 979 (Fed. Cir. 1999)).
Though ambiguities during negotiations between the PTO and
inventor may occur, "the prosecution history can often inform the
meaning of the claim language by demonstrating how the inventor
understood the invention and whether the inventor limited the
invention in the course of prosecution, making the claim scope

- 9 -

narrower than it would otherwise be." Abbott Labs., 566 F.3d at
1288 (quoting Phillips, 415 F.3d at 1317). Statements made
during prosecution can serve to disavow the scope of the patent,
but only in situations where the disclaimer is unambiguous. See
id.; Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366,
1374 (Fed. Cir. 2008) ("[A] patentee may limit the meaning of a
claim term by making a clear and unmistakable disavowal of scope
during prosecution.") (quoting Purdue Pharma L.P. v. Endo
Pharms., Inc., 438 F.3d 1123, 1136 (Fed. Cir. 2006)); Southwall
Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.
1995) ("The prosecution history limits the interpretation of
claim terms so as to exclude any interpretation that was
disclaimed during prosecution.") (citations omitted).

### 3. Extrinsic evidence

Beyond the claim language itself and the intrinsic
record, a court is permitted to rely on extrinsic evidence,
consisting of "all evidence external to the patent and
prosecution history, including expert and inventor testimony,
dictionaries, and learned treatises." Markman, 52 F.3d at 980.
Extrinsic evidence is to be used to aid in a court's
interpretation of the claim language, but "not for the purpose of
varying or contradicting the terms of the claim." Id. (internal
citation omitted); see Phillips, 415 F.3d at 317 (extrinsic

evidence is "less significant than the intrinsic record").

## B. Disputed Claim Terms

There are sixteen (16) disputed terms for the Frontline

Patents.  These terms and the parties' proposed term

constructions for these terms are as follows:

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
|---|---|---|
| **(1) acceptance**<br>'151 Patent<br>(Claims 3, 6, 7, 16, 24, and 33) | No construction necessary. | "an expression by the substitute worker agreeing to fill a position and resulting in an automatic securing of the position when the electronic acceptance is received without further processing for fulfillment of the same position or further selection review" |
| **(2) accepting**<br>'519 Patent<br>(Claims 10 and 13) | No construction necessary. | "the **substitute worker** expressing agreement to fill a position which results in an automatic securing of the position when the electronic acceptance is received without further processing for fulfillment of the same position or further selection review" |
| **(3) accepting**<br>'519 Patent<br>(Claims 24 and 25) | No construction necessary. | "the **second worker** expressing agreement to fill a position which results in an automatic securing of the position when the electronic acceptance is received without further processing for the fulfillment of the same position or further selection review" |

| (4) accepting<br><br>'519 Patent<br>(Claim 30) | No construction necessary. | "the **worker** expressing agreement to fill a position which results in an automatic securing of the position when the electronic acceptance is received without further processing for the fulfillment of the same position or further selection review" |
|---|---|---|
| (5) **securing, in response to receiving the acceptance from the worker . . . the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker**<br><br>'519 Patent<br>(Claim 10) | No construction necessary. | "automatically **electronically** halting further processing for the fulfillment of the same position by other **substitute** workers upon **electronic** receipt of an acceptance from the **substitute** worker and filling the posted position with said **substitute** worker without further selection review" |
| (6) **securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 13) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other **substitute** workers upon receipt of an acceptance from the **substitute** worker and filling the posted position with said **substitute** worker without further selection review" |

| (7) securing, in response to the receiving a response accepting step<br><br>'519 Patent<br>(Claim 30) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other **substitute** workers upon receipt of an acceptance from the worker and filling the posted position with said worker without further selection review" |
|---|---|---|
| (8) securing, in response to the receiving a response accepting step<br><br>'519 Patent<br>(Claim 24 and 25) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other workers upon receipt of an acceptance from the **second** worker and filling the posted position with said **second** worker without further selection review" |
| (9) securing, in response to the receiving a response accepting step<br><br>'519 Patent<br>(Claim 30) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other workers upon receipt of an acceptance from the worker and filling the posted position with said worker without further selection review" |

- 13 -

| (10) computer readable medium '519 Patent (Claims 13 and 30) | Something on which information may be carried that is readable by a computer | "any medium that participates in providing instructions to a processor for execution including, but not limited to, non-volatile media, volatile media, and transmission media such as, for example, optical or magnetic discs, dynamic memory, coaxial cables, copper wire, fiber optics, conductors that comprise a bus, acoustic, or electromagnetic waves such as those generated during radio frequency and infrared data communications, floppy disks, flexible disks, hard disks, magnetic tape, magnetic media, CD-ROMs, DVDs, optical media, punch cards, paper tape, physical media with patterns of holes, RAMs, PROMs, EPROMs, FLASH-EPROMs, memory chips or cartridges, carrier waves, and other medium that a computer can read" |
|---|---|---|
| (11) substitute fulfillment '151 Patent (Claim 3, 6, 7, 16, 24, and 33) '519 Patent (Claim 10, 13, 24, and 25) | No construction necessary | "location of a replacement to fill a temporary employee absence in an organization" |

- 14 -

| (12) performing substitute fulfillment

'151 Patent (Claim 3, 16, 24, and 33)

'519 Patent (Claim 10 and 13) | No construction necessary. | "performing centralized substitute fulfillment" |
|---|---|---|
| (13) substitute fulfillment system

'151 Patent (Claim 6 and 7)

'519 Patent (Claims 10, 13, 24, and 25) | No construction necessary. | "centralized substitute fulfillment system" |
| (14) position fulfillment

'519 Patent (Claim 30) | No construction necessary. | "location of a worker to fill a position in an organization" |
| (15) performing position fulfillment

'519 Patent (Claim 30) | No construction necessary. | "performing centralized position fulfillment" |

| (16) providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position<br><br>'151 Patent (Claims 3, 16, 24, and 33) | No construction necessary. | "providing by one or more computers for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position on a website" |
|---|---|---|

## C. Claim Construction by Claim Terms

The parties arguments over the proper construction of the claims are in the groupings that follow:

### 1. acceptance & accepting (terms 1-4)

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
|---|---|---|
| (1) acceptance<br><br>'151 Patent (Claims 3, 6, 7, 16, 24, and 33) | No construction necessary. | "an expression by the substitute worker agreeing to fill a position and resulting in an automatic securing of the position when the electronic acceptance is received without further processing for fulfillment of the same position or further selection review" |

- 16 -

| (2) accepting '519 Patent (Claims 10 and 13) | No construction necessary. | "the **substitute worker** expressing agreement to fill a position which results in an automatic securing of the position when the electronic acceptance is received without further processing for fulfillment of the same position or further selection review" |
| --- | --- | --- |
| (3) accepting '519 Patent (Claims 24 and 25) | No construction necessary. | "the **second worker** expressing agreement to fill a position which results in an automatic securing of the position when the electronic acceptance is received without further processing for the fulfillment of the same position or further selection review" |
| (4) accepting '519 Patent (Claim 30) | No construction necessary. | "the **worker** expressing agreement to fill a position which results in an automatic securing of the position when the electronic acceptance is received without further processing for the fulfillment of the same position or further selection review" |

Frontline argues that this term uses common language that is clear and unambiguous, and should be used for its ordinary meaning. (Pl.'s Op. Br. 12.) CRS argues that the claim prosecution history of Frontline's patents is important here. Frontline was required to add the word "acceptance" to its '151 patent in order to distinguish Frontline's patent from prior art. Also, that the Patent Examiner relied on highly detailed

definitions of these words that Frontline submitted during the prosecution process. Specifically, that once an "acceptance" occurs, the party that made the acceptance has secured the position. That is, unlike prior art, there is no intermediary step. (Def.'s Op. Br. 15-17.)

Frontline responds that claim terms should be defined consistent with the specifications and as used in other claim terms within the same patent. The patents use "accept" and "acceptance" in other places that are consistent with the ordinary meaning of the word. Thus, because they are using it for the ordinary meaning of the word in the specifications, the ordinary meaning of the words should be applied to the claim terms as well. (Pl.'s Resp. 5.)

Frontline also responds that while it distinguished its product from the prior art, it did not limit the meaning of its claim terms through a disclaimer. See Purdue Pharma, 438 F.3d at 1136-1137; (Pl.'s Resp. 5-6.) Further, Frontline argues that CRS's language goes too far. While Frontline had stated that there is no additional process between acceptance and the substitute securing the position, it did not say that there is "no further review," which is the language that CRS wishes to introduce. (Pl.'s Resp. 7-8.) Frontline further responds that to use CRS's proposed language would make the claim terms incoherent.

- 18 -

"Under the doctrine of prosecution disclaimer, a
patentee may limit the meaning of a claim term by making a clear
and unmistakable disavowal of scope during prosecution." Purdue
Pharma L.P. v. Endo Pharmaceuticals Inc., 438 F.3d 1123, 1136
(Fed. Cir. 2006)(citing Seachange Int'l, Inc. v. C-COR Inc., 413
F.3d 1361, 1372-73 (Fed. Cir. 2005); Omega Eng'g, Inc. v. Raytek
Corp., 334 F.3d 1314, 1323-26 (Fed. Cir. 2003)). "This may occur,
for example, when the patentee explicitly characterizes an aspect
of his invention in a specific manner to overcome prior art."
Purdue Pharma, 438 F.3d at 1136 (citing Microsoft Corp. v.
Multi-Tech Sys., Inc., 357 F.3d 1340, 1349 (Fed. Cir. 2004)
(interpreting "sending," "transmitting," and "receiving"
limitations as requiring direct transmission over telephone line
when patentee stated that invention transmits over a standard
telephone line, thus disclaiming transmission over a
packet-switched network)).

Frontline cannot debate that it did not affirmatively
assert that its product was different from the prior art because
in its patent there is no process that takes place between a
substitute accepting an open position and that position being
filled.  Indeed, Frontline was not "describing a property" of the
patent as in Purdue but made a much stronger distinction between
the fundamentals of its product and the prior art regarding the
automatic securing of the position without further processing.

- 19 -

However, there are a few problems with CRS's proposed language. While CRS's argument makes sense for the "acceptance" term in the '151 patent, it does not explain why the same is true for the terms in the '519 patent, except that the '519 patent comes later in time and that there were similar (but not as in depth) findings by the Patent Examiner. Additionally, CRS's language seems to go much farther than simply interjecting that there is no intermediary process between the substitute accepting the position and the position opening being removed. By including "automatically" in the definitions for "securing" below, CRS's concern is addressed without overly limiting the claim terms. Thus, the Court will not provide a definition for these terms.

2. claims involving "securing" (terms 5-9)

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
|---|---|---|
| **(5) securing, in response to receiving the acceptance from the worker . . . the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker**<br><br>'519 Patent<br>(Claim 10) | No construction necessary. | "automatically **electronically** halting further processing for the fulfillment of the same position by other **substitute** workers upon **electronic** receipt of an acceptance from the **substitute** worker and filling the posted position with said **substitute** worker without further selection review" |
| **(6) securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 13) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other **substitute** workers upon receipt of an acceptance from the **substitute** worker and filling the posted position with said **substitute** worker without further selection review" |
| **(7) securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 30) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other **substitute** workers upon receipt of an acceptance from the worker and filling the posted position with said worker without further selection review" |

| **(8) securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 24 and 25) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other workers upon receipt of an acceptance from the **second** worker and filling the posted position with said **second** worker without further selection review" |
|---|---|---|
| **(9) securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 30) | No construction necessary. | "automatically halting further processing for the fulfillment of the same position by other workers upon receipt of an acceptance from the worker and filling the posted position with said worker without further selection review" |

Frontline argues that this term uses common language that is clear and unambiguous, and should be used for its ordinary meaning. (Pl.'s Op. Br. 12.) CRS's argument here is similar to the argument above regarding the "accepting" terms. CRS argues that the "securing" terms should also include language in their definitions showing that once a substitute worker accepts a position, that position is "secured" in a way that stops any further processing (i.e. the position is immediately secured"). CRS also argues that the securing step is performed electronically.

The analysis of the problem is the same as the analysis for "acceptance" and "accepting." Thus, the Court will define the terms by adding "automatically" before the securing terms.

3. computer readable medium

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
|---|---|---|
| **(10) computer readable medium**<br><br>'519 Patent (Claims 13 and 30) | Something on which information may be carried that is readable by a computer | "any medium that participates in providing instructions to a processor for execution including, but not limited to, non-volatile media, volatile media, and transmission media such as, for example, optical or magnetic discs, dynamic memory, coaxial cables, copper wire, fiber optics, conductors that comprise a bus, acoustic, or electromagnetic waves such as those generated during radio frequency and infrared data communications, floppy disks, flexible disks, hard disks, magnetic tape, magnetic media, CD-ROMs, DVDs, optical media, punch cards, paper tape, physical media with patterns of holes, RAMs, PROMs, EPROMs, FLASH-EPROMs, memory chips or cartridges, carrier waves, and other medium that a computer can read" |

Frontline argues that this term uses common language that is clear and unambiguous, and should be used for its ordinary meaning. (Pl.'s Op. Br. 12.) CRS argues that Frontline inventors gave a specific definition for "computer-readable medium" in its patent specifications and that this definition is controlling here. See Phillips, 415 F.3d at 1316. CRS's proposed language is a condensed version of the specification.

Frontline responds that in order for this definition to replace the common language, it would have had to propose a definition that is inconsistent with the common usage. Phillips, 415 F.3d at 1316. Even if construed as the definition, it is only the first sentence that would be part of the definition. The examples should be left out. Thus, limiting the statement to "any medium that participates in providing instructions to processor 52 for execution."

CRS responds that, even if only the first line is used, the definition would be different than the "dictionary definition" that Frontline proposes. It would instead be, "any medium that participates in providing instructions to a processor for execution."

Generally, patent terms are bound to the definitions given by the specifications in the patent as patentees can be their own lexicographer. However, CRS's proposed definition is not only a convoluted mess, it includes much more than necessary (i.e. all the examples). Thus, the Court will adopt as the definition the first line of the patent specification, "any medium that participates in providing instructions to a processor for execution."

4. substitute fulfillment

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
|---|---|---|
| **(11) substitute fulfillment**<br><br>'151 Patent (Claim 3, 6, 7, 16, 24, and 33)<br><br>'519 Patent (Claim 10, 13, 24, and 25)<br><br>as well as **position fulfillment**<br><br>'519 Patent (Claim 30) | No construction necessary | "location of a replacement to fill a temporary employee absence in an organization" |

Frontline argues that this term uses common language that is clear and unambiguous, and should be used for its ordinary meaning. (Pl.'s Op. Br. 12.) CRS argues that its proposed language is what Frontline included in its patent specifications. CRS also argues that common sense should make the definition of "position fulfillment" (while this was not defined by Frontline in any patent) to have a parallel definition.

Frontline argues that it did not provide a special definition as the sentence in its patents (pointed to by CRS) actually reads, "To date, location of a replacement to fill a temporary employee absence in an organization, a process referred

- 25 -

to as 'substitute fulfillment,' has generally been an unreliable, labor-intensive, often panic-driven, process." Frontline argues that this was not an attempt to define the term as it is used in its patent.

Frontline did include this language in its patent but it is not in a specification, nor is it an attempt to define the term. Instead, it provided background regarding prior art. The term does not need construction as it is easy to understand. Thus, the Court will not define this term.

5. substitute/position fulfillment (terms 12 - 15)

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
| --- | --- | --- |
| (12) performing substitute fulfillment<br><br>'151 Patent (Claim 3, 16, 24, and 33)<br><br>'519 Patent (Claim 10 and 13) | No construction necessary. | "performing centralized substitute fulfillment" |
| (13) substitute fulfillment system<br><br>'151 Patent (Claim 6 and 7)<br><br>'519 Patent (Claims 10, 13, 24, and 25) | No construction necessary. | "centralized substitute fulfillment system" |

- 26 -

| (14) position fulfillment | No construction necessary. | "location of a worker to fill a position in an organization" |
|---|---|---|
| '519 Patent (Claim 30) | | |
| (15) performing position fulfillment | No construction necessary. | "performing centralized position fulfillment" |
| '519 Patent (Claim 30) | | |

Frontline argues that this term uses common language that is clear and unambiguous, and should be used for its ordinary meaning. (Pl.'s Op. Br. 12.) CRS argues, much like previous arguments, that Frontline has represented its patent to the Patent Examiner as a centralized system in order to distinguish it from prior art. CRS also points to language throughout the patent that implies that the system is a centralized system (i.e. "Plurality of organizations"). Thus, CRS argues that "centralized" should be added to these terms.

Frontline responds that the Patent Examiner only noted the "centralized" language where Frontline distinguished its patent from prior art. That is, that a "centralized system" is provided but is not necessarily the only system provided.

This argument is a much farther reach for CRS than the "accepting" language. The idea of the "centralized" system is referenced tangentially and not a large topic of the prosecution history. Thus, the Court will not define these terms.

6. posting

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
|---|---|---|
| **(16) providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position**<br><br>'151 Patent (Claims 3, 16, 24, and 33) | No construction necessary. | **"providing by one or more computers** for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position on a website" |

Frontline argues that this term uses common language that is clear and unambiguous, and should be used for its ordinary meaning. (Pl.'s Op. Br. 12.) CRS argues that the inclusion of the phrase "by one or more computers" in the amended language also modifies this term. The language in Frontlines patent is as follows:

> "generating and posting by one or more computers a list of one or more positions of one or more absent workers that need to be filled by one or more substitute workers on a website and providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position."

CRS argues that because the term "one or more computers" also modifies the term in question it should be added to that term as well. Frontline responds that rules of grammar

indicate that this phrase "by one or more computers" does not modify the end of the sentence. CRS responds that while grammar may indicate that the phrase does not modify this phrase, common sense requires it.

Although common sense indicates that one or more computers are needed to post the positions, CRS's proposed language does not seem to be required to reach this conclusion. Indeed, including CRS's language makes the sentence read strangely. This construction is not necessary. Thus, the Court will not define this term.

## IV. CONCLUSION

For the reasons stated above, the Court will adopt the following claim construction below. An appropriate order will follow.

| Terms & Patent(s) | Construction |
|---|---|
| **(1) acceptance**<br><br>'151 Patent (Claims 3, 6, 7, 16, 24, and 33) | No construction necessary. |
| **(2) accepting**<br><br>'519 Patent (Claims 10 and 13) | No construction necessary. |

- 29 -

| | |
|---|---|
| **(3) accepting**<br><br>'519 Patent (Claims 24 and 25) | No construction necessary. |
| **(4) accepting**<br><br>'519 Patent<br>(Claim 30) | No construction necessary. |
| **(5) securing, in response to receiving the acceptance from the worker . . . the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker**<br><br>'519 Patent<br>(Claim 10) | **automatically** securing, in response to receiving the acceptance from the worker . . . the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker |
| **(6) securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 13) | **automatically** securing, in response to the receiving a response accepting step |
| **(7) securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 30) | **automatically** securing, in response to the receiving a response accepting step |
| **(8) securing, in response to the receiving a response accepting step**<br><br>'519 Patent<br>(Claim 24 and 25) | **automatically** securing, in response to the receiving a response accepting step |

- 30 -

| | |
|---|---|
| **(9) securing, in response to the receiving a response accepting step**<br><br>'519 Patent (Claim 30) | **automatically** securing, in response to the receiving a response accepting step |
| **(10) computer readable medium**<br><br>'519 Patent (Claims 13 and 30) | any medium that participates in providing instructions to a processor for execution |
| **(11) substitute fulfillment**<br><br>'151 Patent (Claim 3, 6, 7, 16, 24, and 33)<br><br>'519 Patent (Claim 10, 13, 24, and 25) | No construction necessary |
| **(12) performing substitute fulfillment**<br><br>'151 Patent (Claim 3, 16, 24, and 33)<br><br>'519 Patent (Claim 10 and 13) | No construction necessary. |
| **(13) substitute fulfillment system**<br><br>'151 Patent (Claim 6 and 7)<br><br>'519 Patent (Claims 10, 13, 24, and 25) | No construction necessary. |

| (14) position fulfillment<br><br>'519 Patent<br>(Claim 30) | No construction necessary. |
|---|---|
| (15) performing position fulfillment<br><br>'519 Patent<br>(Claim 30) | No construction necessary. |
| (16) providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position<br><br>'151 Patent<br>(Claims 3, 16, 24, and 33) | No construction necessary. |

