IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRONTLINE TECHNOLOGIES, INC., :    CIVIL ACTION
:    NO. 07-2457
    Plaintiff, :
:
       v. :
:
CRS, INC., :
:
    Defendant. :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                JULY 26, 2012


**I.   INTRODUCTION**

Plaintiff Frontline Technologies, Inc. ("Plaintiff") filed this patent infringement and breach of contract action against Defendant CRS, Inc. ("Defendant") over a technology that facilitates replacement of absent workers with substitute workers.  Plaintiff avers that Defendant's SubFinder products infringe U.S. Patent No. 6,675,151 ("the '151 patent") for substitute worker technology.  Second Am. Compl. ¶ 14, ECF No. 96.  In its Second Amended Complaint, Plaintiff pleads two counts: (1) infringement of the '151 patent and (2) breach of a license agreement between Plaintiff and Defendant.  Id. ¶¶ 36-43, 52-55.

Currently pending before the Court is Defendant's Motion for Summary Judgment on non-infringement, priority date,

invalidity, and various contract claims.  For the reasons set forth below, the Court will deny Defendant's Motion.

## II.  BACKGROUND

Plaintiff alleges patent infringement of its '151 patent that claims a labor database wherein customers access a website to post worker absences for which substitutes are needed.  Id. ¶¶ 9, 12.  Plaintiff's product practicing the claimed invention is called "Aesop."  Id. ¶ 9.  Substitutes access Aesop to search for posted worker absences and to commit to filling vacancies.  Id.  Users access Aesop via the Internet using a web interface or via a telephone interactive voice response ("IVR") system.  Id.

On January 6, 2004, the U.S. Patent and Trademark Office ("PTO") issued the '151 patent for the substitute worker technology.  Id. ¶ 12.  The '151 patent claims priority of filing date to U.S. Patent No. 6,334,133 ("the '133 patent").  Plaintiff is the assignee and owner of the '151 patent.  Second Am. Compl. ¶ 13.  In February 2004, Frontline Data, Plaintiff's predecessor, filed a patent infringement suit against Defendant.  Frontline Data and Defendant reached a settlement agreement in November 2004 whereby Frontline Data agreed to license its technology to Defendant in return for royalties.  Id. ¶¶ 15-16.

Plaintiff alleges Defendant failed to pay royalties pursuant to the limited licensing agreement ("License Agreement").  Id. ¶¶ 18-23.  In particular, and relevant here, the License Agreement required a fee on gross revenues from the sale of "Licensed Products and Services."  License Agreement ¶ 3.1, Am. Compl. Ex. B, ECF No. 29-2.  The agreement defines "Licensed Products and Services" as those products that would "infringe an unexpired, valid, and enforceable claim" of the '133 patent or '151 patent.  Id. ¶ 1.1.  After an audit in 2007, Plaintiff determined that Defendant failed to pay the proper royalties under the License Agreement.  Specifically, Plaintiff alleged that Defendant failed to account for sales where a substitute teacher used a telephone to fill a wanted position. Defendant contended that the License Agreement did not cover such uses because they did not infringe either the '133 patent or '151 patent.  Plaintiff disagreed, terminated the License Agreement, and filed the instant lawsuit on June 18, 2007.  See Compl., ECF No. 1.

On August 8, 2007, the PTO granted an ex parte reexamination of claims 3 through 13 of the '151 patent.  Second Am. Compl. ¶ 28.  Accordingly, the Court placed the action in suspense on November 19, 2007.  Order, Nov. 19, 2007, ECF No. 15.  During the PTO reexamination, claims 14 through 55 were

3

added to the '151 patent and claims 3, 6, 9, and 14 through 55 were listed in the reexamination certificate as patentable.[1]  See Second Am. Compl. ¶¶ 31, 32; Am. Compl. Ex. C.

On September 30, 2008, during the '151 patent reexamination period, the PTO issued U.S. Patent No. 7,430,519 ("the '519 patent"), titled "Substitute Fulfillment System," a continuation-in-part of the '151 patent, to Roland R. Thompson, Michael S. Blackstone, and Ralph Julius.  Am. Compl. ¶¶ 33-34. Plaintiff is assignee and owner of the '519 patent.  Id. ¶ 35.

On January 14, 2010, Plaintiff filed an Amended Complaint, which alleges three counts against Defendant.[2] Plaintiff claims Defendant infringed, continues to infringe, and induced infringement of the '151 patent associated with Defendant's SubFinder products ("Count I").  Id. ¶¶ 37-39. Plaintiff claims Defendant infringed, continues to infringe, and induced infringement of the '519 patent with Defendant's SubFinder products ("Count II").  Id. ¶¶ 45-47.  And Plaintiff claims Defendant breached the License Agreement ("Count III").

---

[1]      The Court refers to the reexamined '151 patent and its claims as the "'151 patent."

[2]      The counts are not numbered in the Amended Complaint. For ease of identification, the Court will number the counts.

4

Plaintiff seeks declaratory and injunctive relief and damages.
Id. at 9-10.

On February 3, 2010, Defendant filed an Amended Answer
and Counterclaims ("Answer") that raises various affirmative
defenses and counterclaims, states that Plaintiff has breached
the License Agreement, and denies all claims for infringement of
the '151 and '519 patents.[3]  Defendant requests declaratory and
injunctive relief and damages.  Answer 16-17, ECF No. 36.

On February 23, 2010, Plaintiff filed an amended reply
denying Defendant's counterclaims and asserting various
affirmative defenses.

On February 8, 2011, the Court issued an order and
accompanying memorandum construing certain disputed claim terms.

---

[3]     Defendant asserts seven counterclaims.  Answer 12-16.
Defendant seeks a declaratory judgment that Defendant did not
infringe the '151 patent ("Counterclaim I").  Defendant seeks a
declaratory judgment that the '151 patent is invalid
("Counterclaim II").  Defendant seeks a declaratory judgment
that it has not infringed the '519 patent ("Counterclaim III").
Defendant seeks a declaratory judgment that the '519 patent is
invalid ("Counterclaim IV").  Defendant seeks a declaratory
judgment that it did not breach the License Agreement for the
'151 patent ("Counterclaim V").  Defendant claims Plaintiff
wrongfully terminated the License Agreement ("Counterclaim VI").
And Defendant claims Plaintiff breached the License Agreement by
failing to accord Defendant most-favored nation treatment and to
reduce the royalty obligation of Defendant and its sublicensees
in accordance with paragraph 3.3 of the License Agreement
("Counterclaim VII").

Order, Feb. 8, 2011, ECF No. 56; Mem. Op., Feb. 8, 2011, ECF No.
55.  The parties continued with discovery.

On August 12, 2011, Plaintiff granted Defendant a
Covenant Not to Sue on the '519 patent.  Mot. to Dismiss Ex. A,
Aug. 15, 2011, ECF No. 66-1.  On August 15, 2011, Plaintiff
filed a Motion to Dismiss Counterclaims III and IV and a Motion
to Amend the Complaint.  Id.  On September 1, 2011, Defendant
opposed the Motion to Dismiss.  Opp'n, Sept. 1, 2011, ECF No.
67.  On December 23, 2011, the Court issued an order and
accompany memorandum granting Plaintiff's Motion to Dismiss and
granting Plaintiff leave to amend its Amended Complaint.[4]  See
Order, Dec. 23, 2011, ECF No. 95; Mem. Op., Dec. 23, 2011, ECF
No. 94.

On November 21, 2011, Defendant filed a Motion for
Summary Judgment on the issues of non-infringement, priority
date, invalidity, and most favored nations defense.  ECF No. 77.
Plaintiff responded in opposition.  ECF No. 89.  Defendant filed
a reply.  ECF No. 91.  The motion is now fully briefed and ripe
for disposition.

---

[4]      Plaintiff's Second Amended Complaint is the same as
its Amended Complaint, but removes its claim of infringement of
the '519 Patent.  Thus, Count I remains for infringement of the
'151 patent, and Count III remains for breach of the License
Agreement.

### III. STANDARD OF REVIEW

Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact."  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party.  "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party."  Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)).  While the moving party bears the initial burden of

showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 250.

## IV.  DISCUSSION

Defendant moves for summary judgment on non-infringement, filing date priority, invalidity for failure to meet the written description requirement, and on application of the most favored nations clause in the License Agreement.  The Court addresses each in turn and will deny Defendant's Motion on each issue.

### A.   Non-infringement

Defendant first moves for summary judgment on its counterclaim of non-infringement of the asserted claims of the '151 patent: claims 3, 6, 7, 16, 24, and 33.

#### 1.   Applicable Law

Patent infringement occurs when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent."

35 U.S.C. § 271(a) (2006).  One can also be liable for inducing another to infringe.  Id. § 271(b).  A court's analysis of patent infringement is a well-established two-step process: (1) the meanings of disputed claims are construed; and (2) the allegedly infringing device is compared to the claims as construed.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996); Wavetronix L.L.C. v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009).  In this case, the Court already construed the meaning of the disputed claims.  Thus, the Court now moves to step two.

"Patent infringement occurs when a device . . . that is literally covered by the claims or is equivalent to the claimed subject matter, is made, used, or sold, without the authorization of the patent holder, during the term of the patent."  Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1476 (Fed. Cir. 1998).  "Infringement requires that every limitation of a claim be met in the accused structure either exactly or by an equivalent."[5]  Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1125 (Fed. Cir. 1996).

---

[5]     Plaintiff does not argue that Defendant's SubFinder products infringe the '151 patent under the doctrine of equivalents.

9

2.   <u>Analysis</u>

Defendant contends that its SubFinder products do not infringe independent claims 3 and 6 of the '151 patent.[6]  Claims 3 and 6 of the '151 patent provide as follows:

3.   A method for performing substitute fulfillment for a plurality of different organizations comprising:

> receiving absentee information representing an absent worker that will be or is physically absent from an organization worksite via at least one communication link;
>
> generating and posting by one or more computers a list of one or more positions of one or more absent workers that need to be filled by one or more substitute workers on a website and providing, for one or more of the positions, information indicating directly or indirectly an organization worksite location for the respective position;
>
> receiving a response comprising an acceptance, by the one or more computers, from a substitute worker selecting a posted position on the website via an Internet communication link; and
>
> securing, in response to receiving the acceptance form [sic] the substitute worker, via the Internet communication link and the one or more computers, the posted position for the substitute worker who selected the posted

---

[6]     Defendant also moves for summary judgment of non-infringement on claims 7, 16, 24, and 33.  Those claims are dependent claims.  Thus, Defendant argues only for non-infringement on independent claims 3 and 6 because if the Court concludes that summary judgment is appropriate on those independent claims, then summary judgment must follow for the dependent claims.

position to fill in for the absent worker,
the securing comprising halting, at the one
or more computers, further processing to
fulfill the posted position with any other
substitute worker.

'151 Patent Reexamination Certificate col.1 ll.28-52.

6. A substitute fulfillment system that secures one
or more substitute workers for a plurality of
organizations comprising:

a database comprising worker records, said worker
records having information associated with
workers for each of the organizations, and
substitute records, said substitute records
having information associated with at least
one substitute worker; and

one or more computers comprising a server
connected to the database, the server
configured for:

receiving absentee information representing an
absent worker that will be or is physically
absent from an organization worksite or via
at least one communication link;

generating and posting a list of one or more
positions of one or more absent workers that
need to be filled by one or more substitute
workers on a website and providing, for one
or more of the positions, information
indicating directly or indirectly an
organization worksite location for the
respective position;

receiving a response comprising an acceptance
from a substitute worker selecting a posted
position on the website via an Internet
communication link; and

securing, in response to receiving the acceptance
from the substitute worker, via the Internet
communication link and the one or more

11

> computers, the posted position for the
> substitute worker who selected the posted
> position to fill in for the absent worker,
> the securing comprising halting, at the one
> or more computers, further processing to
> fulfill the posted position with any other
> substitute worker.

Id. col.1 l.53-col.2 l.17.

In its Motion, Defendant only argues that its SubFinder products do not meet the limitations contained in the final clause of claims 3 and 6.  Specifically, Defendant argues that all of its accused SubFinder products do not automatically secure a position in response to receiving an acceptance, as required under the Court's claim construction of the asserted claims of the '151 patent.  Defendant also argues that SubFinder versions 5.9-5.11 do not secure a position "in response to" receiving an acceptance.

a.   Whether all SubFinder products automatically secure a substitute position in response to receiving an acceptance

Briefly, the record reflects that the all SubFinder products alleged to infringe the '151 patent operate as follows. A substitute must first log in to the SubFinder product to view any positions available.  Pl.'s Memo. in Opp'n to Def.'s Mot. for Summ. J. 10, ECF No. 89 [hereinafter Pl.'s Br.].  In all SubFinder products, once absences are known, a substitute may

12

request to view all jobs that are suitable for that substitute —
that is, those jobs for which the substitute is qualified.  Id.
Once SubFinder returns a list of suitable jobs, the substitute
then may review this listing and select to view additional job
details.  Id.  Once a substitute views the additional details,
in versions 5.7 and 5.8, the substitute has the following three
options: "Reject Job," "Accept Job," and "Don't Accept Job."
Id. at 11.  In versions 5.9-5.11, the substitute has the
following three options: "Yes," "No," and "Return to Available
Jobs."  Id.  The substitute then selects an option and either
proceeds to accept that job or continues searching to find a job
suitable to the substitute.

        Defendant argues that all of its SubFinder systems do
not automatically secure the substitute the position as required
by claims 3 and 6.  Defendant explains that in the Court's claim
construction, it construed the term "securing" as used in claims
3 and 6 of the '151 patent as "automatically securing."  See
Order 2, Feb. 8, 2011, ECF No. 56.[7]  In all of the accused

---

[7]        Due to a typographical error within the Court's claim
construction order, the Court attributed the following claim
language to claim 10 of the '519 patent: "securing, in response
to receiving the acceptance from the worker . . . the securing
comprising halting, at the one or more computers, further
processing to fulfill the posted position with any other
substitute worker."  This claim language appears within claims
3, 6, 7, 16, 24, and 33 of the '151 patent.  See, e.g., '151

SubFinder products, a substitute clicking on the "Accept Job" button (in SubFinder versions 5.7 and 5.8) or clicking on the "Yes" button (in SubFinder versions 5.9-5.11) does not automatically result in the position being secured.  Defendant argues that after a substitute clicks either the "Accept Job" button or the "Yes" button, the system engages "in further processing steps to check to see if the job is still available and to verify that the substitutes' status has not change[d]."  Def.'s Memo. in Supp. of Mot. for Summ. J. 39, ECF No. 77 [hereinafter Def.'s Br.].  Therefore, SubFinder does not automatically secure the position.  Specifically, Defendant argues that in SubFinder versions 5.7 and 5.8:

> [U]pon receipt of the substitute's response the system validates that (1) the position is still available and has not been filled; (2) the position has not been locked; (3) the position is not at a time conflicting with another position that substitute is working; and (4) the substitute cannot work on days the substitute is scheduled to work as a regulator teacher unless the substitute has a "dual status."

Id.  Therefore, Defendant argues that its SubFinder versions 5.7 and 5.8 do not automatically secure the substitute the position.  Similarly, Defendant argues that its SubFinder versions 5.9-5.11 perform all of the same validations as versions 5.7 and 5.8, but

---

Patent Reexamination Certificate col.1 ll.45-52.  Accordingly, the Court's construction of that phrase applies to the '151 patent and not the '519 patent.

also perform an additional nine validations.  Failure of any of these validations prevents the substitute from securing the position and therefore does not automatically secure the substitute position.

Plaintiff, on the other hand, argues that all SubFinder versions automatically secure a substitute position notwithstanding their further validations.  In all SubFinder versions, Plaintiff agrees that once a substitute clicks either "Accept Job" or "Yes," SubFinder validates that substitute is eligible to accept that particular position.  Pl.'s Br. at 10-11.  In addition to this validation, which may take several steps, however, all SubFinder versions then update the SubFinder database of available jobs to indicate that the particular job the substitute accepted is now filled.  See Reiss Decl. 33-34, Pl.'s Br. Ex. 1.  Then, SubFinder sends a confirmation message to the substitute.  Id.  Once this update occurs, the database lists the job as "filled," the job will not be listed as available, and any other substitutes that may have been viewing the job at the same time will be unable to accept that same job. Id.

With these facts, Plaintiff argues that all SubFinder versions automatically secure the posted position within the meaning of claims 3 and 6.  Specifically, Plaintiff argues that

15

the "'automatically securing' is satisfied in SubFinder when, in response to receiving the input from the 'Accept Job' (versions 5.7 and 5.8) or 'Yes' button (versions 5.9-5.11), the Job table in the SubFinder database is updated to indicate that the particular job is filled."  Pl.'s Br. 15.  According to Plaintiff's expert, Steven Reiss, the updating of the Job database permanently removes the job from consideration by other substitutes.  Reiss Decl. ¶ 48, Pl.'s Br. Ex. 1.B.  This removal is done without any consideration of other substitutes for the job.  Therefore, Plaintiff argues that while SubFinder does indeed perform several validations before a substitute receives confirmation that he or she was awarded the position, none of these validations concern whether some other substitute should receive the position.  Therefore, the validations do not bring SubFinder outside of the claim language.

        The Court finds that the grant of summary judgment revolves around the claim term "automatically securing" and whether this term encompasses SubFinder's post-acceptance validations.  Defendant concedes that if "automatically securing" does encompass post-acceptance validations, that there are conflicting facts as to whether Defendant's SubFinder products meet the claim limitations in claims 3 and 6.  See Def.'s Reply Memo. in Supp. of Mot. for Summ. J. 4, ECF No. 92

16

[hereinafter Def.'s Reply Br.].  Accordingly, the disposition of
Defendant's Motion revolves around the proper construction of
the claim term "automatically securing."  In this regard,
although the Court reviewed the parties' initial claim
construction briefs, opposition briefs, reply briefs, held oral
argument, and ruled upon the parties' disputed claim
constructions, the Court finds that some additional construction
of the claim term "automatically securing" is needed.[8]

The parties' previously submitted the following
competing constructions of the terms "acceptance" and
"securing":

---

[8]       The Federal Circuit explained, "[A]fter the court has
defined the claim with whatever specificity and precision is
warranted by the language of the claim and the evidence bearing
on the proper construction, the task of determining whether the
construed claim reads on the accused product is for the finder
of fact."  PPG Indus. v. Guardian Indus. Corp., 156 F.3d 1351,
1355 (Fed. Cir. 1998).  Nonetheless, after reviewing the
parties' briefing on summary judgment, as well as the various
expert reports submitted, it is apparent to the Court that the
parties, without additional clarification of the term
"automatically securing," would attempt to argue construction of
that term to the jury.  The Court cannot allow this to occur.
See Am. Patent Dev. Corp. v. Movielink, L.L.C., 637 F. Supp. 2d
224, 230-31 (D. Del. 2009) (citing O2 Micro Int'l Ltd. v. Beyond
Innovation Tech. Co., 521 F.3d 1351, 1361-63 (Fed. Cir. 2008)).
Thus, the Court will now construe the term "automatically
securing."

| Terms & Patent(s) | Plaintiff Frontline's Proposed Construction | Defendant CRS's Proposed Construction |
|---|---|---|
| **(1) acceptance**<br><br>'151 Patent (Claims 3, 6, 7, 16, 24, and 33) | No construction necessary. | "an expression by the substitute worker agreeing to fill a position and resulting in an automatic securing of the position when the electronic acceptance is received without further processing for fulfillment of the same position or further selection review" |
| **(5) securing, in response to receiving the acceptance from the worker . . . the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker**<br><br>'151 Patent (Claims 3, 6, 7, 16, 24, and 33) | No construction necessary. | "automatically **electronically** halting further processing for the fulfillment of the same position by other **substitute** workers upon **electronic** receipt of an acceptance from the **substitute** worker and filling the posted position with said **substitute** worker without further selection review" |

During claim construction, the Court declined to construe the term "acceptance."  The Court addressed Defendant's concerns when construing "securing, in response to receiving the acceptance from the worker . . . the securing comprising

18

halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker" by adding the word "automatically" before "securing."  Frontline Placement Techs., Inc. v. CRS, Inc., 824 F. Supp. 2d 602, 612 (E.D. Pa. 2011).

Defendant's present construction of the term "automatically securing" mirrors its proposed construction during claim construction, a proposed construction that the Court rejected.  Specifically, the Court explained, "CRS's language seems to go much farther than simply interjecting that there is no intermediary process between the substitute accepting the position and the position opening being removed. By including 'automatically' in the definitions for 'securing' below, CRS's concern is addressed without overly limiting the claim terms."  Id. at 610.  Defendant now argues that the Court's claim construction requires there to be no processing between a substitute's acceptance and the position being filled. Indeed, Defendant argues that the Court explained that Plaintiff, in attempting to overcome a rejection of the '151 patent in view of U.S. Patent No. 6,466,914 ("Mitsuoka"), argued to the PTO that "its product was different from the prior art because in its patent there is no process that takes place between a substitute accepting an open position and that

19

position being filled." <u>Frontline</u>, 824 F. Supp. 2d at 610.
Defendant argues that this language from the Court's claim
construction opinion is dispositive here.  Defendant is
incorrect.  Defendant's argument is taken out of context and is
in fact inconsistent with the Court's conclusion that
Defendant's proposed construction overly limited the '151 patent
claims.

Defendant's construction of "automatically securing"
centers on Plaintiff's statements during the reexamination of
the '151 patent.  During that reexamination, the PTO initially
rejected claims 3 and 6 as unpatentable in light of Mitsuoka.
In pertinent part, Mitsuoka disclosed an Internet-based
contractor placement method.  <u>See</u> '914 Patent col.2 ll.18-25.
Relevant here, the method in Mitsuoka required the contractor to
apply for an offered position, out of a listing of available
positions, by clicking "Apply."  <u>Id.</u> col.9 ll.7-8.  Thereafter,
a computer program would select the appropriate contractor out
of the pool of contractors that applied.  <u>Id.</u> col.9 ll.30-31.
Once that occurred, the contractor would be awarded the
position.  <u>Id.</u> col.9 ll.35-39.

In attempting to overcome Mitsuoka, Plaintiff
explained that in the '151 patent the acceptance of a position
was different from clicking "Apply" in Mitsuoka because it is

the "receipt of an acceptance in the claimed system [that] results in an automatic securing of the position." Response to Office Action 34, Feb. 18, 2009, Def.'s Br. on Meaning of Disputed Claim Terms Ex. 10, ECF No. 41. In contrast, before any securing of the position in Mitsuoka, a contractor selector program ran and selected a contractor. Put another way, in Mitsuoka contractors could apply for positions and then the computer system selected the contractor best qualified for the position. But, the '151 patent does not require any selection from a pool of candidates. Once a substitute accepts an offered position, and that position is secured, it is no longer available to any other substitute.

The '151 patent's prosecution history makes clear, as the Court recognized in its claim construction, that the '151 patent requires automatic securing of a position to the extent that once a substitute accepts a position from a listing of opportunities, there is no further selection from a pool of candidates by the system. The Court did not limit the claims to include Defendant's proposed construction that would prevent no additional processing of a <u>particular</u> substitute's acceptance before the securing occurred. Indeed, the prosecution history supports the Court's conclusion. Plaintiff explained, "[W]hen acceptance is received from the substitute worker on an Internet

communication link, the posted position is <u>substantially</u> immediately secured to the substitute worker." <u>Id.</u> at 35 (emphasis added); <u>see also id.</u> ("[T]he system of the claim is configured so that the decision of filling a position is made by the substitute electronically sending the acceptance, which directly causes the securing.  In contrast, in Mitsuoka the decision to award the contract translation to the independent contractor is made subsequently by the contractor selector portion 320.").  Thus, the prosecution history does not reflect that no validating can occur between acceptance and securing. The only post-acceptance system activity that may not occur is the processing described in Mitsuoka.  Accordingly, the Court now clarifies that "automatically securing" does not necessarily mean that there is no validating between securing and the position being filled.  "Automatically securing" means only that the claimed system does not choose the particular substitute for the position from a pool of substitutes that have applied for the position.

Given this construction of "automatically securing," there is a genuine dispute of material fact whether the SubFinder products automatically secure a substitute position. The parties agree that all SubFinder products perform some processing after a substitute clicks "Accept" or "Yes" to a

22

posted available position.  Therefore, under the Court's
construction, this processing does not necessarily render all
SubFinder products not infringed.  Indeed, the parties provide
conflicting expert declarations on whether such processing
results in an automatic securing.  Compare Reiss Decl. 30-38,
Pl.'s Br. Ex. 1.A, with Parmet Decl. ¶¶ 84-88, Def.'s Br. Ex.
6.B.[9]  Such an expert dispute precludes the Court from granting
summary judgment.  See, e.g., Metro. Life Ins. Co. v. Bancorp
Servs., L.L.C., 527 F.3d 1330, 1338-39 (Fed. Cir. 2008).


> 2.    Whether SubFinder versions 5.9-5.11
>       automatically secure a substitute position
>       "in response to" receiving an acceptance

        Defendant makes a further non-infringement argument
that SubFinder versions 5.9-5.11 do not "secur[e] in response to
receiving the acceptance from the substitute worker."  See,
e.g., '151 Patent Reexamination Certificate col.1 ll.45-46

---

[9]      Jeff Parmet's expert report is the subject of a Motion
in Limine pursuant to Federal Rule of Evidence 702.  See ECF No.
72.  In particular, Plaintiff argues that Mr. Parmet's expert
report includes Mr. Parmet's own claim construction, and then
Mr. Parmet impermissibly applies his own claim construction to
the issues in this case.  The Court takes no position on the
admissibility of Mr. Parmet's report at this time.  Even
assuming Mr. Parmet could testify to the information contained
in his report at trial, for the reasons set forth above, the
Court will deny Defendant's Motion for Summary Judgment on non-
infringement.

(emphasis added).  Defendant contends, and Plaintiff concedes, that SubFinder versions 5.9-5.11 have the ability to "lock" a "job for a particular substitute and prevent[] all other substitutes from viewing that particular job details webpage." Def.'s Br. 42.  This lock also prevents any other substitute from accepting a particular job.  The lock is set for a specific length of time.  Once the timer runs, if the substitute fails to either click "Yes," "No," or "Return to Jobs," the job is unlocked and other substitutes may accept the job.  Defendant contends claims 3 and 6 require a halting of further processing to be in response to an acceptance.  Therefore, because the halting, by way of the lock in SubFinder versions 5.9-5.11, occurs as soon as a substitute views the details for a position the halting is not "in response" to an acceptance, but occurs before acceptance, once a substitute views the details of a particular position.  Thus, SubFinder versions 5.9-5.11 do not infringe the '151 patent.

Plaintiff argues that Defendant's non-infringement theory is not relevant here because it ignores Plaintiff's infringement theory.  Namely, SubFinder versions 5.9-5.11 meet the claim language requiring "securing, in response to receiving the acceptance . . . comprising halting . . . further processing to fulfill the posted position with any other substitute worker"

24

because when a substitute clicks the "Yes" button the SubFinder database is updated to indicate the job is filled and then permanently removes that position from being offered to other substitutes.  Accordingly, Plaintiff argues the halting of further processing occurs once the Job table is updated and the position is marked filled.  The prior halting from the lock does not render the claim not infringed.  Moreover, that feature is temporary.  As such, the lock does not forever prevent the job from becoming available to other substitutes.  And the lock does not halt the processing of the Job table update before the position is secured.

Defendant correctly points out that the final clause of claims 3 and 6, as relevant to its theory of non-infringement, requires two events to occur "in response to receiving the acceptance from the substitute worker": "(1) securing the posted position for the substitute worker who selected the posted position; and (2) halting further processing to fulfill the posted position with any other substitute." Def.'s Reply Br. 5.  Defendant fails to recognize that SubFinder's locking feature does not necessarily prevent both of these events from occurring.  The parties do not dispute that the locking feature halts, at least temporarily, further processing to fulfill the posted position with any other

substitute.  This initial halting is not in response to
receiving an acceptance, but only occurs when a substitute views
the details of a particular position.  If the substitute then
accepts the position, and SubFinder validates this acceptance,
the parties do not dispute that at that time the Job table in
the SubFinder database is updated to indicate the position is
filled and that position is then permanently removed from the
job pool.

Therefore, Defendant's motion turns on the whether the
initial halting precludes finding that SubFinder versions 5.9-
5.11 infringe claims 3 and 6 of the '151 patent because that
halting occurs before a substitute actually accepts the
position.  Furthermore, when viewed through the lens of a single
substitute, the question is really whether there are two
haltings of further processing or whether there is one halting.
That is, either the first halting is before the securing and is
temporary, and the second halting is in response to the securing
and is permanent, or there is one halting.  With the former, the
first halting would not preclude infringement because the second
halting still occurs.  See Gillette Co. v. Energizer Holdings,
Inc., 405 F.3d 1367, 1371-72 (Fed. Cir. 2005) (explaining that
when claim language uses phrase "comprising," "[t]he addition of
elements not recited in the claim cannot defeat infringement").

26

With the latter, the temporary halting becomes permanent once acceptance is received, but there was only one halting and this was not in response to receiving an acceptance because the halting continued even through the time when the database is updated.  If this is the case, SubFinder versions 5.9-5.11 could not infringe the '151 patent.

Under the facts of this case, the Court will deny Defendant's Motion for Summary Judgment.  Plaintiff and Defendant's experts dispute whether the lock amounts to a halting within the meaning of the '151 patent.  Compare, Reiss Decl. ¶¶ 59-63, Pl.'s Br. Ex.1.B, with Parmet Decl. ¶¶ 20.3, 49.2, 80.2, 89, 92, Def.'s Br. Ex. 6.B.  The parties never submitted "halting" for construction.  Therefore, the term receives its plain and ordinary meaning.  Cf. Thorner v. Sony Computer Entm't Am. L.L.C., 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.").  The '151 patent and the prosecution history do not elucidate whether this halting may be temporary or not.  See Ex Parte Reexamination Commc'n Transmittal Form 5, May 27, 2009, Def.'s Br. on Meaning of Disputed Claim Terms Ex. 12 (describing halting but failing to specify whether such

halting was temporary or permanent).  The American Heritage
Dictionary defines halt as "a suspension of movement or
progress, especially a temporary one."  <u>Am. Heritage Dictionary</u>
<u>of the English Language</u> 792 (4th ed. 2009).  Given the expert
dispute, and the possible meaning of halting within the '151
patent, a reasonable jury could conclude that halting may be
temporary and there may be multiple haltings in SubFinder
versions 5.9-5.11 that would still read onto claims 3 and 6 of
the '151 patent.  This dispute precludes summary judgment.  <u>Cf.</u>
<u>PPG Indus. v. Guardian Indus. Corp.</u>, 156 F.3d 1351, 1355 (Fed.
Cir. 1998).


        B.   <u>Priority Date</u>

        Defendant also moves for summary judgment on the
filing date priority of the '151 patent.  Defendant contends
that the '151 patent is not entitled to the filing date of the
'133 patent because the '133 patent specification does not
adequately disclose claims 3 and 6 of the '151 patent.


        1.   <u>Applicable Law</u>

        A patent application may be deemed filed as of the
date of an earlier patent application so long as the invention
claimed in the later invention is fully disclosed, pursuant to

28

35 U.S.C. § 112, in the earlier application.  See 35 U.S.C. §

120 (2006) ("An application for patent for an invention

disclosed in the manner provided by the first paragraph of

section 112 of this title in an application previously filed in

the United States . . . shall have the same effect, as to such

invention, as though filed on the date of the prior application

. . . ."").  In turn, § 112 provides, in pertinent part:

> The specification shall contain a written description
> of  the invention, and of the manner and process of
> making and using it, in such full, clear, concise, and
> exact terms as to enable any person skilled in the art
> to which it pertains, or with which it is most nearly
> connected, to make and use the same . . . .

Id. § 112.  This "written description" requirement is satisfied

if the specification of the patent "'allow[s] persons of

ordinary skill in the art to recognize that [the inventor]

invented what is claimed.'"  Crown Packaging Tech., Inc. v Ball

Metal Beverage Container Corp., 635 F.3d 1373, 1380 (Fed. Cir.

2011) (alterations in original) (quoting Ariad Pharm., Inc. v.

Eli Lilly & Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en

banc)).  In this regard, the written description "must

'reasonably convey[] to those skilled in the art that the

inventor had possession of the claimed subject matter as of the

filing date.'"  Id. (alternation in original) (quoting Ariad,

598 F.3d at 1351 (internal quotation marks omitted)).

29

"Possession means 'possession as shown in the disclosure' and 'requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.'"  Id. (quoting Ariad, 598 F.3d at 1351).

When attempting to show that a patent is not entitled to an earlier filing date, an alleged infringer will attempt to show that the earlier filed patent's specification does not provide an adequate written description to support the later patent's claims.  The initial burden is upon the alleged infringer to put forth evidence that the later patent is not entitled to the earlier filing date.  Tech. Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1327 (Fed. Cir. 2008).  Then, the patentee has the burden to produce evidence to contradict the alleged infringer's evidence.  Id.  The ultimate burden of persuasion, however, rests on the alleged infringer as the challenger to the priority date based on an inadequate written description in the earlier patent.  Id. at 1328.  The alleged infringer's burden is clear and convincing.  Id.  While the adequacy of the written description is a question of fact, see Bradford Co. v. Conteyor N. Am., Inc., 603 F.3d 1262, 1268 (Fed. Cir. 2010), courts may still grant summary judgment, even when there are expert declarations supporting each party's position.

See Williams v. Gen. Surgical Innovations, Inc., 178 F. Supp. 2d
698, 709 (E.D. Tex. 2002).

2.   Analysis

Defendant argues that the following language from
claims 3 and 6 in the '151 patent fails to find support in the
'133 patent specification:

> generating and posting a list of one or more positions
> of one or more absent workers that need to be
> filled by one or more substitute workers on a
> website and providing, for one or more of the
> positions, information indicating directly or
> indirectly an organization worksite location for
> the respective position[.]

'151 Patent Reexamination Certificate col.1 ll.34-40, col.2
ll.1-6.  Specifically, Defendant argues, relying upon Mr.
Parmet's expert declaration, the '133 patent omits any mention
of the "organization worksite location" and fails to disclose
that "any information indicating directly or indirectly an
organization worksite location for the respective positions" is
provided "on a website"; or provided as part of the "generating
and posting" of a list of available positions.  See id. col.1
ll.34-40.  Defendant also argues that even assuming the '133
patent specification does disclose the posting on a website of
worksite location information, the specification does not
disclose that this information both directly and indirectly

31

provides the organization worksite location for the respective position as required by the claims.[10]  Moreover, Defendant argues the '133 patent specification fails to adequately disclose the "website" within the '151 patent claims.

Plaintiff responds, through the expert declaration of Edward Yourdon, that the '133 patent specification does adequately disclose all of the elements in claims 3 and 6 of the '151 patent.  Specifically, Mr. Yourdon disagrees with Mr. Parmet and explains that the language within the specification discloses that the listing of opportunities is provided to a substitute on a website, and this listing contains the location of the school.  Mr. Yourdon admits that the phrase "organization worksite location" is absent from the '133 patent specification, but that the worksite location, as a school name, is disclosed. Moreover, Plaintiff argues that the '133 patent discloses three reports that may be downloaded from a website and provided to replacement workers.  These reports provide information such as

---

[10]      Claims 3 and 6 recites that the disclosed information "directly or indirectly" provides "an organization worksite location for the respective position."  '151 Patent Reexamination Certificate col.1 ll.38-40, col.2 ll.5-6.  The parties do not dispute that despite the disjunctive "or," for the '151 patent to have priority, the '133 patent specification must disclose that the information provided to the substitute both directly and indirectly provides "an organization worksite location for the respective position."  Id. col.1 ll.39-40.

school name.  Plaintiff also argues that the '133 patent does
disclose that this information both directly and indirectly
indicates the worksite location.  In this regard, Plaintiff
argues that in the instance that a substitute teacher is
unfamiliar with the school's geographic location the school name
will "indirectly" indicate the worksite location.  In contrast,
if a substitute is familiar with the geographic location of the
school, the school name will "directly" indicate the worksite
location.

          In this case, there is a genuine dispute of material
fact as to whether the '133 patent specification supports claims
3 and 6 of the '151 patent.  Written description can be
satisfied with "words, structures, figures, diagrams, formulas,
etc."  Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1572 (Fed.
Cir. 1997).  The claims of a patent do not require "in haec
verba support" in the specification.  Lampi Corp. v. Am. Power
Prods. Inc., 228 F.3d 1365, 1378 (Fed. Cir. 2000).  The key
inquiry is whether the disclosure "reasonably conveys" to one of
ordinary skill in the art "that the inventor had possession at
that time of the later claimed subject matter."  Id.  This
disclosure may be either express or inherent.  Inherent
disclosure requires that the missing descriptive matter is
"'necessarily present in the thing described in the reference,

33

and that it would be so recognized by persons of ordinary skill.'" In re Robertson, 169 F.3d 743, 745 (Fed. Cir. 1999) (quoting Cont'l Can Co. U.S.A., Inc. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991)).  That said, possession means that the inventor actually invented it, not that it would have been obvious to do so based upon the specification.  See Lockwood, 107 F.3d at 1572.

In pertinent part, the '133 patent specification provides as follows.  The '133 patent generally describes an automated substitute fulfillment system that will allow an organization to fill substitute positions and have those substitutes work within the organization on a temporary basis without any personal interaction between the organization and the substitute to secure such a position.  See '133 Patent col.4 l.36-col.5 l.23.  The '133 patent specification provides that the claimed invention includes a "substitute fulfillment database" and that this database includes "classroom location information."  Id. col.8 ll.16-40.  The database also includes a variety of other information, including the "school name."  See id. fig. 6.  The goal of this database is for it to contain "the information needed to perform substitute fulfillment for a particular organization."  Id. col.8 ll.55-57.  The specification also provides, "using the information in the

34

[substitute fulfillment] database 34, the server may also generate a listing of opportunities for replacement workers 22 and make the listing available through a web site interface." Id. col.10 ll.32-35.

The parties' experts disagree on whether the '133 specification adequately discloses claims 3 and 6 of the '151 patent.  Defendant's expert, Mr. Parmet, explained that the above language does not disclose an adequate written description because it does not explain what information is actually disclosed within that listing of opportunities.  See Parmet Decl. ¶ 105, Def.'s Br. Ex. 6.B.  Plaintiff's expert disagrees. Mr. Yourdon declares that to one of ordinary skill in the art, the specification shows that the listing of opportunities includes information within the substitute fulfillment database. This database includes school information.  Thus, while it does not use the phrase "organization worksite location," the school name and classroom location within the database demonstrate that the patentee possessed the matter claimed in the '151 patent. Yourdon Decl. ¶ 119, Pl.'s Br. Ex. 2.B.  Moreover, Mr. Yourdon also declares that this school information directly and indirectly provides the worksite location.  Id. ¶ 123.

Both experts provide reasonable opinions in light of the '133 patent specification and their disagreement precludes

granting summary judgment.[11]  Indeed, and contrary to Defendant's
argument, the fact that the specification does not explain that
the organization worksite location is produced on a website, but
only provides that information from the substitute database is
produced, is not fatal to the '151 patent's priority date.
"[I]t is unnecessary to spell out every detail of the invention
in the specification; only enough must be included to convince a
person of skill in the art that the inventor possessed the
invention . . . ." <u>LizardTech, Inc. v. Earth Res. Mapping,
Inc.</u>, 424 F.3d 1336, 1345 (Fed. Cir. 2005).  The specification,
as noted by Mr. Yourdon, provides that the substitute database
can include school name and classroom location.  This database
is then used to produce, on a web site interface, job
opportunity listings to potential substitutes.  It follows,
therefore, that a reasonable jury could conclude that the
information produced in the job opportunity listing would be the
same information as contained within the substitute database,
information such as school name and classroom location.[12]

_____

[11]        Again, Mr. Parmet's expert report is subject to a
Motion in Limine.  <u>See</u> <u>supra</u> note 7.  The Court takes no
position on that Motion now because even assuming Mr. Parmet
could testify as to what he explains in his report the Court
will deny Defendant's Motion.

[12]        Plaintiff also argues that Figure 12 in the '151
patent discloses several reports that include the school

With respect to Defendant's argument that the '133 patent specification does not disclose that the worksite location is directly and indirectly provided to a substitute worker, the Court finds that a reasonable jury could conclude the '133 patent specification is to the contrary.  Defendant seems to concede that a school name would constitute indirect location information, and that Plaintiff explained as much within the prosecution of the '151 patent.  <u>See</u> Def.'s Reply Br. 12-13.  As to direct worksite location, the specification provides that the substitute database includes classroom location, school data, and also that the database can include any information "needed to perform substitute fulfillment for a

_____

location.  Mr. Yourdon opines that these figures are sufficient for one of skill in the art to adequately disclose the '151 patent's claims.  Yourdon Decl. ¶¶ 113-15, Pl.'s Br. Ex. 2.B.

Plaintiff is on less sure footing with this argument. The '133 patent does provide examples for reports that include school location.  <u>See</u> '151 Patent fig. 12.  Yet, the '133 patent only provides that those reports are made available to "any parties designated by the client 56 as 'need-to-know' parties 14, 50." '133 Patent col.9 ll.33-34.  The potential substitute is referred to in the patent using reference number 22. Therefore, the Figure 12 reports do not appear to support Mr. Yourdon's conclusion that those reports, which arguably include worksite location, are produced to potential substitutes as required by claims.  Nonetheless, the Court need not decide whether Figure 12 supports the written description requirement because it finds that other portions of the specification provide sufficient basis that a reasonable jury could conclude that the '133 patent adequately discloses claims 3 and 6 of the '151 patent.

particular organization." '133 Patent col.8 ll.56-57.  A
reasonable jury could view this information as showing direct
worksite location — that is, "a specific location for the
substitute to report."  Response to Office Action 30, Feb. 18,
2009, Def.'s Br. on Meaning of Disputed Claim Terms Ex. 10.

Finally, Defendant makes much of the fact that the
specification discloses a "web site interface," and this is not
the equivalent of a website as claimed in the '151 patent.  Mr.
Yourdon, who has a degree in computer science, explained that
"mak[ing] the listing available through a web site interface" is
"the equivalent to posting it on a website."  Yourdon Dep.
216:18-217:4, Oct. 20, 2011, Def.'s Br. Ex. 20.  Defendant
argues that the specification simply provides no objective
disclosure that a "web site interface" and a website are
equivalent.  Yet, the specification does not provide any
objective disclosure that they are not equivalent.  A written
description is viewed through the lens of one of ordinary skill
in the art at the time of the invention.  Plaintiff provides
expert testimony from Mr. Yourdon that one of ordinary skill in
the art would understand a web site interface to be the

equivalent of a website.[13]  This precludes the Court granting

summary judgment.[14]


>    C.    Invalidity for Written Description

Defendant also moves for summary judgment on

invalidity of the asserted claims of the '151 patent.  In

particular, Defendant argues that the asserted claims of the

'151 patent are invalid for failing to satisfy the written

description requirement of § 112.  Defendant argues that the

written description in the '151 patent adds nothing to the

written description within the '133 patent.  Indeed, Defendant

---

[13]    The Court notes that a leading treatise explains, in
the context of summary judgment under § 112, that competing
expert declarations run the risk of focusing on what was
"obvious to them from the specification" and that this confuses
the written description requirement of possession of the thing
claimed.  See 3-7 Donald S. Chisum, Chisum on Patents § 7.04
(Matthew Bender 2012).  This concern does not trouble the Court
here, however.  Both Messrs. Parmet and Yourdon's declarations
do not discuss what was obvious to them, but only what, in their
opinions, one skilled in the art at the time of the invention
would understand the '133 patent specification as disclosing.

[14]    Even if the Court were to assume that Mr. Parmet's
declaration was the sole declaration in this litigation, the
specification itself provides details — such as that the
substitute database includes school location information and may
be displayed on a web site interface to a substitute — that
precludes summary judgment.  Given the specification, and under
the clear and convincing standard, the Court cannot conclude
that any reasonable jury would find that the '133 patent
specification, clearly and convincingly, did not adequately
disclose claims 3 and 6 of the '151 patent.

provides no additional argument other than its argument that the '151 patent should not be given the filing date of the '133 patent.  Thus, for the reasons set forth above, the Court will also deny Defendant's Motion for Summary Judgment on invalidity.

D.   <u>Most Favored Nations Provision</u>

Lastly, Defendant moves for summary judgment on its fifth defense of unclean hands, six defense of wrongful termination, counterclaim of a declaration of no breach of contract (Counterclaim V), counterclaim of wrongful contract termination by Plaintiff (Counterclaim VI), and a counterclaim of breach of contract under the most favored nations provision (Counterclaim VII).  For all of these defenses and counterclaims, Defendant's sole argument is that Plaintiff failed to honor the most favored nations provision within the License Agreement.

The most favored nations ("MFN") provision in the License Agreement provides:

> If FrontLine enters into an agreement with another entity that is related to the Licensed Patents and requires the payment of a royalty to Frontline that is less than the royalty rate CRS is paying under this Agreement, CRS shall be entitled to a reduction of the royalty rate equal to the royalty rate as provided for in the other agreement.  This provision shall only apply if the terms and conditions of the other agreement are materially similar to the terms

40

> and conditions in this Agreement. FrontLine is
> permitted to redact the name of its licensees as well
> as any business-sensitive provisions in such other
> agreements not otherwise relied upon by FrontLine that
> the other agreement is not materially similar to
> justify a reduction in the royalty rate.

License Agreement ¶ 3.3, Am. Compl. Ex. B.

Defendant moves for summary judgment related to this provision by arguing that Plaintiff breached the MFN provision by not limiting Defendant's royalty obligation to $50,000. Therefore, Plaintiff's decision to terminate the License Agreement because Defendant did not pay sufficient royalties was wrongful. Specifically, Defendant argues that Plaintiff entered into a licensing agreement related to both the '133 and '151 patents with eSchool, a competitor of both Plaintiff and Defendant, on April 12, 2005. That licensing agreement was not for a running royalty rate, but a lump-sum payment of $50,000. Thus, Defendant contends that under the MFN provision, it was entitled to the benefit of this lump sum royalty rate so long as the two license agreements were materially similar. As to this point, Defendant, through its expert Walter Bratic, argues that the terms of the eSchool license agreement are materially similar to the License Agreement between Plaintiff and Defendant. Therefore, Defendant contends that by March 31, 2007, the end of the last quarter before Plaintiff terminated

the License Agreement, it had made cumulative payments to
Plaintiff in the amount $109,012, much greater than the $50,000
it should have owed Plaintiff had the MFN been honored.
Accordingly, it could not have breached the License Agreement
for failure to pay sufficient royalties.

Plaintiff contends that before it entered into the
eSchool license agreement, Defendant materially breached the
License Agreement by not paying Plaintiff sufficient royalties.
Therefore, it excused Plaintiff of its duty under the MFN
provision.  Plaintiff also argues that there is a genuine
dispute of material fact as to whether the eSchool license
agreement and the License Agreement in this case are materially
similar.  Plaintiff also argues that Defendant should now be
estopped from alleging a violation of the MFN provision because
Defendant knew that the eSchool license agreement contained no
rolling royalty.  Therefore, as Defendant continued to pay the
agreed-upon royalty in the License Agreement without invoking
the MFN provision, it cannot now assert the MFN provision as a
defense in this case.

The Court will deny Defendant's Motion for Summary
Judgment on all counterclaims related to the MFN provision.
There is a genuine dispute of material fact as to whether
Defendant materially breached the License Agreement before

42

Plaintiff entered into the eSchool license agreement.  Under Pennsylvania law, which governs the License Agreement, see License Agreement ¶ 9.1, Am. Compl. Ex. B, a material breach requires proof of the following elements:

a)  the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b)  the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c)  the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d)  the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e)  the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012).  If there was a material breach, the law in Pennsylvania excuses the non-breaching party from performing any remaining duties under a contract.  Id. This would mean that if Defendant did indeed materially breach the License Agreement before Plaintiff entered into the eSchool license agreement, Plaintiff would be excused from its duty under the MFN provision, even if Plaintiff was unaware of this breach at that time.  See Coll. Point Boat Corp. v. United

States, 267 U.S. 12, 15-16 (1925); 14 Richard A. Lord, Williston on Contracts § 43:12 (4th ed. 1999); Restatement (Second) of Contracts § 237 cmt. c (1981).

In this regard, Plaintiff argues that before it entered into the eSchool license agreement, Defendant had failed to comply with the 8-percent royalty.  This non-compliance, specifically that Defendant only paid Plaintiff $11,989 in the first quarter of 2005, but Defendant owed Plaintiff $52,126, amounted to a material breach of the License Agreement before Plaintiff entered into the eSchool license agreement.[15]

With respect to those royalty payments, Defendant concedes, for purposes of summary judgment, that it did not

---

[15]     Defendant argues that whether it materially breached the License Agreement for an underpayment of royalties is not relevant to its Motion for Summary Judgment.  Defendant argues that if such an underpayment was relevant, the MFN provision could never be invoked such that Defendant should have only owed Plaintiff a total of $50,000 in royalties.  The Court agrees with Defendant if the material breach for underpayment of royalties occurred after Plaintiff entered into the eSchool license agreement.  The same does not hold true, however, if the material breach for underpayment of royalties occurred before Plaintiff entered into the eSchool license agreement.  Before Plaintiff entered into the eSchool license agreement, Defendant was still bound by the 8-percent royalty provision in the License Agreement.  A material breach of that provision can, under appropriate circumstances, discharge Plaintiff's obligation to honor the MFN provision.  Whether that is the case here will be resolved by the jury.

fulfill its obligation under the License Agreement.  Whether such a breach is material is a question for the jury.  See Int'l Diamond, 40 A.3d at 1272 (explaining under Pennsylvania law whether breach is material is fact question generally left to jury).  Defendant offers no argument that such a failure to pay royalties would not be a material breach of contract.  Indeed, failure to pay royalties due may be a material breach.  See, e.g., IGEN Int'l Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 314-15 (4th Cir. 2003).  Accordingly, the Court will deny summary judgment.[16]


**V.   CONCLUSION**

            For the reasons set forth above, the Court will deny Defendant's Motion for Summary Judgment.  An appropriate order will follow.

---

[16]         Having concluded that there is a genuine dispute of material fact as to whether Defendant breached the License Agreement before Plaintiff entered into the eSchool license agreement, the Court declines to address whether the eSchool license agreement and the License Agreement are materially similar.  Any adjudication of that issue would be moot should the jury find that Defendant materially breached the License Agreement before Plaintiff entered into the eSchool license agreement.