IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRONTLINE TECHNOLOGIES, INC., <br><br> Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> CRS, INC., <br><br> Defendant/Counterclaim Plaintiff. | Civil Action No. 07-2457 <br><br> Hon. Eduardo C. Robreno |

**CRS'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF NON-INFRINGEMENT AND FOR CLARIFICATION OF THE COURT'S REVISED CLAIM CONSTRUCTION**

Defendant-Counterclaim Plaintiff CRS, Inc. hereby moves for reconsideration of the Court's order denying partial summary judgment on the issue of non-infringement and for clarification of the Court's revised claim construction. A memorandum in support of this motion and a draft Order are attached. Counsel for Frontline has indicated that it opposes this motion.

Dated: August 9, 2012

Respectfully submitted,

/s/ *Darrel C. Karl*
Finnegan, Henderson, Farabow,
 Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

Charles S. Marion
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4119
*Attorneys for CRS, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| FRONTLINE DATA, INC., | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| v. | ) ) ) | Civil Action No. 07-2457 |
| | ) | Hon. Eduardo C. Robreno |
| CRS, INC., | ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) ) | |

**[PROPOSED] ORDER**

**AND NOW**, on this ___ day of _____, 2012, it is hereby **ORDERED** that CRS'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF NON-INFRINGEMENT AND FOR CLARIFICATION OF THE COURT'S REVISED CLAIM CONSTRUCTION is **GRANTED.** Accordingly, the Court's modified construction of the term "securing" as set forth in its July 26, 2012 Memorandum (Dkt. 104) is revised to mean "automatically securing without further selection review." The Court's July 26, 2012 Order (Dkt. 105) shall be modified to provide that "Partial Summary Judgment on CRS's Second Defense (Non-Infringement) and Counterclaim Count I (Declaratory Judgment of Noninfringement) that the accused SubFinder versions 5.7, 5.8, 5.9, 5.10, and 5.11 do not infringe reexamined claims 3, 6, 7,16, 24, or 33 of U.S. Patent No. 6,675,151 is GRANTED. CRS's motion for partial summary judgment on all other

grounds is DENIED.

**AND IT IS SO ORDERED.**

_____
**EDUARDO C. ROBRENO, J.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| FRONTLINE TECHNOLOGIES, INC., | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 07-2457 |
| | ) | Hon. Eduardo C. Robreno |
| CRS, INC., | ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) ) | |

**CRS'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING
PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF NON-INFRINGEMENT AND
<u>FOR CLARIFICATION OF THE COURT'S REVISED CLAIM CONSTRUCTION</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................1

II.   THE MITSUOKA PATENT DISCLOSURE....................................................................2

III.  FRONTLINE'S ACTIONS AND REMARKS DURING REEXAMINATION ................4

IV.   ARGUMENT................................................................................................................5

      A.   The Court's Modified Claim Construction Is Not Consistent with the
           Entire Mitsuoka Patent Disclosure..........................................................................5

      B.   Summary Judgment Is Appropriate Under the Correct Claim
           Construction............................................................................................................7

I. **INTRODUCTION**

Defendant-Counterclaim Plaintiff CRS, Inc. ("CRS") respectfully request reconsideration of the Court's July 26, 2012 Memorandum (Dkt. 104) and Order (Dkt. 105) denying CRS's Motion for Partial Summary Judgment on the issue of noninfringement. In the course of denying CRS's motion, the Court clarified that the "automatically securing" phrase "means only that the claimed system does not choose the particular substitute for the position from a pool of substitutes that have applied for the position." Dkt. 104 at 22. It went on to find that a genuine dispute of material fact existed as to whether the SubFinder products automatically secure a substitute position. Dkt. 104 at 22-23. In so doing, the Court's analysis was premised on its understanding that the prior art Mitsuoka patent (Ex. 1) ─ which the U.S. Patent and Trademark Office ("PTO") used to invalidate the original claims of the '151 patent during reexamination ─ employed a computer system that "selected the contractor best qualified for the position" from "a pool of candidates." Dkt. 104 at 21.

The Court's opinion, however, does not appear to recognize and appreciate that the Mitsuoka patent disclosed a number of different embodiments, some of which did not "choose the particular substitute for the position from a pool of substitutes that have applied for the position."[1] One such embodiment was designed to operate in completely different manner such as, for example, hiring the *first* suitable contractor applying for the posted position. In that scenario, the applicant's qualifications are not compared with reference to those of any other candidate.

---

[1] Dkt. 104 at 22 (emphasis added). The Court also stated that "automatically securing" does not necessarily mean that there is no validating between securing and the position being filled." Dkt. 104 at 22. Presumably the Court meant to refer to validating "between receiving the acceptance and the position being filled," as such language would track what it had said two sentences earlier in its opinion and "the position being filled" is necessarily part of the "securing" step.

1

CRS appreciates that the Court's construction of the claims continues to evolve as it gains greater understanding and familiarity with the Mitsuoka patent and the prosecution history. However, as things stand, the Court's modified claim construction is still problematic and incomplete. On the one hand, the Court stated "[t]hat the only post-acceptance system activity that may not occur is the processing described in Mitsuoka," yet on the other hand it declined to hold that Frontline's amended claims precluded a "validating" step, Dkt. 104 at 22, evidently not recognizing that this type of processing is disclosed by and in fact is essential to the fundamental operation of Mitsuoka "first to apply" embodiments. Therefore, the Court's construction should exclude such a validating step by requiring that the securing be done "automatically without further selection review." Accordingly, CRS requests that Court modify its claim construction of "automatically securing" so as to be consistent with the entire Mitsuoka disclosure and Frontline's related admissions made during prosecution, and reconsider its denial of CRS's motion for summary judgment in light of such a modified claim construction.

## II.     THE MITSUOKA PATENT DISCLOSURE

The Mitsuoka patent discloses a number of different embodiments of its job brokering apparatus. In some of those embodiments, "the contractor determination portion determines the contractor who actually contracts the job from among the contractor candidates who applied for the job." Ex. 1 at col. 2, lns. 59-62. For example, in the "Fourth Embodiment" of Mitsuoka's invention, factors such as "the contractors' aptitude, experience, and desired remuneration are considered" are considered and weighed so that "the job provider can automatically offer the job to the most appropriate contractor." Ex. 1 at col. 11, lns. 57-58, col. 16, lns. 3-4.

Mitsuoka's "First Embodiment," however, operates completely differently. In this embodiment, a notice about an available job is sent out to all contractors registered with the system, inviting them to apply for the job. Ex. 1 at col. 8, lns. 48-54. The individual contractors then can

"check an offered job description on-screen and decide whether to apply for the job or not." Ex. 1 at col. 8, lns. 65-57. If they wish to apply for the job, they push "the button 'Apply' on the screen shown in FIG. 6." Ex. 1 at col. 9, lns. 7-8. However, rather than comparing candidates' qualifications, the "method of selecting a contractor in this embodiment is to award the offered job to the contractor who was the fastest to apply for this job . . . ." Ex. 1 at col. 9, lns. 23-25; see also col. 9, lns 27-28, 55-56. If the first applicant is selected by contractor selector portion 320, then the system then notifies that applicant that he has been awarded the job. Ex. 1 at col. 9, lns. 31-34, lns. 55-61. "After this, when other contractors apply for the same job, they can be notified in due course that they have not been selected." Ex. 1 at col. 9, lns. 61-63.

Under this approach, the contractor selector portion 320 does not "select[ ] the contractor best qualified for the position" from "a pool of candidates." Dkt. 104 at 21. The selected contractor is simply the first suitable applicant to apply for the position, not necessarily the most experienced or best qualified for the job. See Ex. 1 at col. 3, lns. 62-64 ("It is preferable that said contractor determination portion determines the suitability of each of the determined one or more contractor candidates for the offered job."). Indeed, if the first applicant possesses suitable qualifications for the job, the qualifications of *later* applicants are never examined by the system. However, if the contractor selector portion 320 finds that the first applicant is not suitable for some reason,[2] then the system would award the job to the next qualified applicant who applies.

---

[2] For example, in Mitsuoka's first embodiment the contractor selector portion 320 could still reject the first applicant if he already has another job scheduled for the very day. In contrast, in Mitsuoka's second embodiment, rather than sending a job notice about an available job to all contractors registered with the system, such a notice would only be sent to a subset of contractors who were already determined to be available on the day in question so as to "avoid the transmission of job offer notifications to contractors when it is clear from their schedule that they cannot be contracted for the job." Ex. 1 at col. 10, lns. 43-46. Mitsuoka's first embodiment, however, lacking such pre-screening of candidates, has to verify the first applicant's availability for the job before awarding the position to that applicant.

### III. FRONTLINE'S ACTIONS AND REMARKS DURING REEXAMINATION

When the PTO rejected original claims 3 and 6 as being anticipated by Mitsuoaka, Frontline amended its claims to distinguish that reference. For example, it changed "receiving a response" to "receiving a response <u>comprising an acceptance</u>" and changed "securing" to "secur<u>ing, in response to receiving the acceptance from the substitute worker</u>." Ex. 2 at CRS0004314-15 (emphasis added). It also added language requiring that "the securing comprising substantially immediately halting any current parallel procession for fulfillment of the same position" and, in response to a subsequent written description rejection, thereafter changed that language to "the securing comprising halting, at the one or more computers, further processing to fulfill the posted position with any other substitute worker." Ex. 2 at CRS0004314-15; Ex. 3 at CRS0004403-04, CRS0004421.

In its accompanying remarks, Frontline's attorney contended that "[t]he Mitsuoka 'Apply' has a different meaning that the word '*acceptance*,'" the difference being that "receipt of an 'acceptance' in the claimed system results in an automatic '*securing*' of the position when the electronic acceptance is received," whereas "[t]he Mitsuoka 'contractor selection portion 320' must subsequently perform its selection algorithm and make a selection decision." Ex. 2 at CRS0004344. Frontline's attorney went on to explain on the record that "[t]his means that the system of the claim is configured so that the decision on filling a position is made **<u>by the substitute</u>** electronically sending the acceptance, **<u>which directly causes the securing</u>**," as opposed to Mitsuoka's approach where "the decision to award the contract translation to the independent contractor is made subsequently by the contractor selector portion 320." *Id*. at CRS0004345 (emphasis added). Moreover, Frontline contended that "[t]he Mitsuoka system with its notifications 'in due course,' after the contractor selector portion 320 has made a decision, is the opposite of how the claimed system works, with its acceptance by the substitute operation and its im-

4

mediate halting of parallel processing for fulfillment of the same position."[3]  In particular, Frontline asserted that its "claimed invention is designed to obviate the need for Mitsuoka's 'contractor selection portion 320' ***and its various selection algorithms***."  *Id*. at CRS0004344 (emphasis added).  Significantly, Frontline did not limit its analysis to the situation where Mitsuoka system selected the best qualified applicant from a pool of candidates who have applied for the job.

IV.   ARGUMENT

    A.   **The Court's Modified Claim Construction Is Not Consistent with the Entire Mitsuoka Patent Disclosure**

This "first qualified applicant" embodiment of the Mitsuoka patent is highly relevant to the issues of claim construction and noninfringement in this case.  The processing Mitsuoka uses is not limited to choosing the best applicant from a pool of candidates; it can also include post-application processing to determine whether the first (and perhaps only) candidate to apply is suitable for the position and award that position to that candidate without evaluating the qualifications of other candidates who might later try to apply.   The selection criteria employed in a given scenario is not as important as the fact that Mitsuoka's contractor selector portion 320 always carries out some sort of further selection review.

Frontline amended its claims to distinguish the Mitsuoka patent and, in the process, abandoned as a matter of law any argument that its claims could cover ***any*** of the approaches in Mitsuoka, not merely the "selection from a pool of candidates" embodiment.  This included the situation where the system checks or validates a first applicant's suitability for a position ***before***

---

[3] *Id*. at CRS0004346.  Frontline's expert, who did not review the prosecution history, construed "automatically" securing in a vacuum to mean "to proceed without human control" and concluded that the accused SubFinder products secured positions "automatically" because the SubFinder database was updated "without any human intervention."  Dkt. 89 at 18-19.  That clearly was not what Frontline meant when it talked about "automatic securing" during prosecution, as Mitsuoka likewise secured positions without any human intervention.

awarding the position to the first applicant and notifying any subsequent applicants that their applications have been turned down, i.e., validation before securing the position. The public has a right to rely on Frontline's prosecution history and practice any of Mitsuoka's approaches without fear of liability for infringement.

The Court's modified construction of the phrase "automatic securing" remains incomplete because it is broad enough to encompass the Mitsuoka "first qualified applicant" embodiment. It is for this reason that CRS's proposed claim construction required that the securing be done "automatically . . . without further selection review." By Frontline's own admission, its claimed invention was designed to obviate the need for Mitsuoka's post-application contractor selector portion 320 that provides such post-application selection review.

In the instant case, there is no genuinely disputed issue of material fact regarding the operation of the accused SubFinder products insofar as the "automatically securing" limitation is concerned. Unlike in claimed Frontline system, where all the applicants are pre-qualified and so a particular substitute's acceptance of a posted position inevitably results in that position being secured for that substitute, no similar "automatic" or direct securing occurs in any of the accused products, whether a substitute clicks "Accept" in SubFinder 5.7-5.8 or a substitute clicks "Yes" in SubFinder 5.9-5.11. As discussed in detail in CRS's earlier briefs, in all cases, in response to receiving an "Accept" or "Yes" signal, the SubFinder system runs a series of checks or validations to determine the candidate's suitability for the position. The number of such checks or validations depends on the particular SubFinder model, but the substitute is only awarded the position if he or she passes all such checks or validations. This is not disputed by Frontline in this case. Dkt. 104 at 15-16.

**6**

Frontline argued that such validations did not matter because they did not concern whether some other substitute should receive the position. Dkt. 104 at 16. But the Mitsuoka patent clearly discloses that the selection criteria need not be how a particular applicant compares with other applicants. It can simply be that further selection review merely determines that he was the first suitable applicant to apply for the position. For example, one of the checks conducted by all SubFinder models insures that "the position is not at a time conflicting with another position that the substitute is working." Dkt. 104 at 14. The SubFinder system does not automatically secure the position upon receipt of an "Accept" or "Yes" signal but only after the SubFinder system determines that awarding the position to that substitute would not conflict with another job that the substitute is working on (and all other checks are passed). If the applicant had such a conflict, he would not be suitable for the position. As explained in footnote 2 above, a similar check is inherent in Mitsuoka's first embodiment.

### B. Summary Judgment Is Appropriate Under the Correct Claim Construction

If the Court modifies its construction to reflect the fact that Mitsuoka discloses an embodiment that checks an applicant's suitability for a position after the applicant has applied for the position, without referring to the qualifications of other candidates, then the post-application selection review that takes place to determine the applicant's suitability in the SubFinder system necessarily falls outside the scope of the "automatically securing" language of the asserted claims. Accordingly, the Court should hold that SubFinder versions 8.7-8.11 do not infringe any of the asserted claims in the '151 patent as a matter of law. However, even if the Court should ultimately find that disputed issues of fact remain under its modified construction, it will still be better for all parties concerned that they try the issues of infringement and validity before the jury with a more accurate and complete construction of the claims.

8

Dated: August 9, 2012               Respectfully submitted,

/s/ *Darrel C. Karl*
E. Robert Yoches
Darrel C. Karl
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

Charles S. Marion (Atty ID # 56509)
Noah S. Robbins (Atty. ID # 206803)
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4119

*Attorneys for CRS, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of August, 2012, a true and correct copy of CRS'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF NON-INFRINGEMENT AND FOR CLARIFICATION OF THE COURT'S REVISED CLAIM CONSTRUCTION, a MEMORANDUM in support thereof (with exhibits), and a draft ORDER was served via e-mail upon:

John P. Donohue, Jr.
Woodcock Washburn
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
donohue@woodcock.com

John E. McGlynn
Woodcock Washburn
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104-2891
mcglynn@woodcock.com

R. Scott Tewes
Tewes Law Group LLC
Sugarloaf Corporate Center
2180 Satellite Blvd., Suite 400
Duluth, GA 30097
STewes@TewesLaw.com

/s/ *Darrel C. Karl*
DARREL C. KARL

+